ESTATE of Evelyn McGLOTHLIN, Deceased, Ray McGlothlin, Jr., Executor, and Ray McGlothlin, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 23161.

United States Court of Appeals
Fifth Circuit.

Jan. 10, 1967.

As Amended on Denial of Rehearing
Feb. 23, 1967.

Ronald M. Mankoff, Wentworth, T. Durant, Durant, Mankoff & Davis, Dallas, Tex., for petitioners.

Mitchell Rogovin, Asst. Atty. Gen., Dept. of Justice, Hu S. Vandervort, Jr., Atty., I. R. S., Richard M. Roberts, Acting Asst. Atty. Gen., Meyer Rothwacks, Jonathan S. Cohen, Harry Baum, Lee A. Jackson, Attys. Dept. of Justice, Washington, D. C., for respondent.

Before TUTTLE, Chief Judge, and JONES and GEWIN, Circuit Judges.

TUTTLE, Chief Judge:

This petition for review of a decision of the Tax Court attacks the decision of that court denying as a deduction under Section 165(c) (2), of the Internal Revenue Code of 1954, as a loss incurred in a transaction that was entered into for profit, a substantial sum paid by the taxpayer pursuant to an indemnity agreement which he gave as part of a merger of his corporation with another corporation. The Tax Court held that this expenditure was of a capital nature and was to be added to the cost basis of the stock received on the merger exchange. The term "taxpayer" or "McGlothlin" used in this opinion will refer to Ray McGlothlin, and the personal representative of his deceased wife. The McGlothins filed a joint federal income tax return on the cash method of accounting for the tax year in question.

The issue arose in the following manner. Prior to November 4, 1955, taxpayer owned something more than 94 percent of all of the capital stock of Petroleum Products Refining and Producing Company. This company owned mineral lands in Texas and it also owned three ranches and an oil refinery. During the year 1955, taxpayer was approached by Walter Seligman, a founder and president of Texas Calgary Company, which company owned oil properties in other states. Texas Calgary stock was held by approximately 3,000 shareholders and it was publicly traded on the Toronto Stock Exchange. The proposal was that Petroleum Products would be merged into Texas Calgary and the resulting stock would be listed on the American Stock Exchange. The exchange of stock would, of course, depend upon the agreed values to be assigned to the assets of the two companies.

The three ranches belonging to Petroleum Products were carried on the books of that company at $898,014.08. During negotiations the fair value of these ranches was questioned, but taxpayer undertook to guarantee that these ranches were worth at least $200,000 in excess of the book value, or $1,098,014.08.

The directors of Texas Calgary also objected to the inclusion of the oil refinery in the assets to be included upon the merger. Thereupon, taxpayer caused Petroleum Products to sell the oil refinery to him, thus eliminating it from the assets to be included at the time of the exchange. Subject to the approval of the stockholders, a contract was entered into on November 4, 1955, between the two corporations under the terms of which 6,215,928 shares of Texas Calgary stock (this represented 62 percent of the outstanding stock) was to be given to Petroleum Products stockholders in return for their surrendering their stock in that company.

The assets of Petroleum Products at the time of the exchange excluded the oil refinery, as indicated above, but included the three ranches and McGlothlin's personal guaranty that they would produce to the company within two years a minimum of $1,098,414.14.[1]

On January 25, 1956, the stockholders of Texas Calgary approved the increase of its authorized stock to ten million shares, and the exchange of 6,215,928 for all of the stock of Petroleum Products. This exchange was then consummated shortly thereafter. There is a further agreement that after the merger, Ray McGlothlin would be elected president of the merged companies, at a salary of $25,000 a year. Upon the merger, in 1956, he assumed this office which he held until April 10, 1959.

The company sought unsuccessfully for a couple of years to sell the ranches at what it considered to be a fair price, but these efforts were unsuccessful and, on June 1, 1958, the directors called on McGlothlin to satisfy his obligation on the ranch guaranty. McGlothlin worked out a transaction whereby he would acquire the remaining ranch properties at a sum which, when supplemented by a payment of $261,968.74 by McGlothlin, fully satisfied the guaranty. McGlothlin made this payment on or about December 18, 1958. On or about April 10, 1959, taxpayer sold all of his Texas Calgary stock and resigned from his position of president and director of Texas Calgary. Upon the sale, taxpayer reported no cost basis in the Texas Calgary stock.

On his income tax return for the taxable year ended May 31, 1959, taxpayer claimed a deduction in the amount of $261,968.74 for "loss on ranch guaranty." The Commissioner disallowed this deduction and the proceedings in the Tax Court followed.

In that proceeding, the taxpayer contended that the $261,968.74 payment was a deductible loss incurred in a transaction entered into for profit within the purview of Section 165(c) (2) of the 1954 Code.[2]

The Tax Court held that this agreement could not have produced a personal profit for the taxpayer, although recognizing that he had entered into the transaction in order to end up by holding stock that was listed on the American Stock Exchange. The Court held that the payment was more nearly like a capital cost, and that it should result in increasing

---

1. Paragraph 10 of the Agreement provided as follows:

"Ray McGlothlin individually and personally guarantees that in the event that the three (3) ranch properties included in the assets of Petroleum Products Refining and Producing Company, with a present fair value of one million ninety-eight thousand four hundred fourteen ($1,098,414.14) dollars and fourteen cents, are not sold by January 15, 1958, for an amount not less than the present fair value, that the said Ray McGlothlin will personally guarantee that upon six (6) months' notice by the Board of Directors of Texas Calgary, Texas Calgary shall receive full payment for such ranches or such ranch properties as remain, said payment to be no less than the present fair value of the ranch properties. If the Board of Directors of Texas Calgary rejects a bona fide offer to purchase the aforesaid ranch properties for an amount not less than the present fair value of said properties, or in the event

that the Board of Directors of Texas Calgary rejects a bona fide offer to purchase the aforesaid ranch properties for an amount less than the present fair value of the said properties, said Ray McGlothlin, having agreed to pay the difference between the present fair value and the offering price, then, and in either event, the said Ray McGlothlin is fully discharged from the obligation arising from the guarantee contained in this Paragraph."

2. Internal Revenue Code of 1954:
"Sec. 165, LOSSES.
  *      *      *      *      *
(c) *Limitation on Losses of Individuals.*—In the case of an individual, the deduction under subsection (a) shall be limited to—
  *      *      *      *      *
(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and
  *      *      *      *      * "
(26 U.S.C.1958 ed., Sec. 165.)

taxpayer's basis for his Texas Calgary stock.

From the decision of the Tax Court, taxpayer then took this review to this court.

On this appeal, the Commissioner does not fully support the Tax Court's conclusion that the transaction was not one entered into for profit, but does strongly contend that the transaction truly represented a payment of this amount as part of the cost of acquisition of the Texas Calgary stock. Moreover, the respondent urges that even though the transaction be considered to have created a loss within the contemplation of the income tax statutes, the loss was not one that could be recognized because it was a part of the tax-free reorganization involving Petroleum Products and Texas Calgary.

Petitioner here relies heavily on his argument that the scope of the "transaction" contemplated by Section 165(c) (2) means the "total transaction" and that it is not limited by the bounds of the particular payment obligation which gives rise to the loss. Appellant quotes from Mertens as follows:

"If the original transaction, consisting of several integral components was entered into for profit, all the components making up the one indivisible transaction are a part of a profit transaction."

Mertens, Law of Federal Income Taxation, Sec. 28.34.

Petitioner cites Majorie Fleming Lloyd-Smith, 40 B.T.A. 214, aff'd 116 F. 2d 642 (2 Cir.), cert. denied 313 U.S. 558, 61 S.Ct. 1111, 85 L.Ed. 1543, as authority for the proposition that the discharge of a guaranty in connection with a stock transaction brings it within the contemplation of the statute as a transaction entered into for profit.

The difficulty with this, it seems to us, is that the guaranty entered into by McGlothlin was required by the other party to the merger as a condition for completing the exchange of stock of Texas Calgary for Petroleum Products. Thus, it was part of the "purchase price" of the Texas Calgary stock. As such, it was part of the cost of acquisition of a capital asset. This represents a capital expenditure which must be added to the cost basis of the investment and is to be reflected in the gain or loss realized upon ultimate disposition of the investment. See United States v. St. Joe Paper Co., 5 Cir., 284 F.2d 430, where we repeated what we had earlier said to the effect that "all sums expended toward the acquisition, protection, or preservation of title to property from or by means of which income is intended to be produced are capital expenditures." Jones Estate v. Commissioner of Internal Revenue, 5 Cir., 127 F.2d 231, 232.

Conceptually, it would seem that if the taxpayer's argument here were correct, then a loss sustained by any person upon buying a capital asset, if the loss resulted from the transfer of property at less than the basis in the hands of the taxpayer, would constitute a loss incurred in a transaction entered into for profit. No such construction can possibly be supported.

Furthermore, there is much logic in the Government's contention that, even though there be what under normal tax concepts would amount to a loss here, the taxpayer would not be entitled to claim it as an ordinary loss for the year 1959 because of the tax free reorganization provision of Section 368(a) (1) of the 1954 Code. Taxpayer asserts, and we agree, that the guaranty was given as an integral part of the contract for exchange of stock between the two merging companies. As such, "no loss from the exchange * * * shall be recognized." Section 354(a) (1). See W. D. Haden & Company v. Commissioner of Internal Revenue, 5 Cir., 165 F.2d 588. We agree that even though the indemnity was paid at a later year, the payment was in discharge of an obligation made as a part of the tax free reorganization. See Arrowsmith v. Commissioner of Internal Revenue, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6.

The decision of the Tax Court is affirmed.