M. Seth Horne and Maurine D. Horne, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 2645–70. Filed November 27, 1972.

*Hubert E. Kelly* and *Charles L. Arnold,* for the petitioners.
*Harold E. Patterson,* for the respondent.

Dawson, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1966, 1967, and 1968 in the amounts of $56,280, $23,378, and $66,078, respectively.

Petitioners have conceded one issue. The only issue remaining for decision is whether they are entitled to a deduction for amounts paid in connection with an indemnity agreement entered into by them on behalf of their wholly owned corporation. The issue is argued under sections 162, 165, 166, and 212, I.R.C. 1954.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, the supplemental stipulation of facts, and the exhibits attached to both

are incorporated herein by this reference. We have limited our findings to those facts which are pertinent to our decision.

The petitioners, M. Seth Horne and Maurine D. Horne, are husband and wife and, at the time of filing the petition herein, were residents of Phoenix, Ariz. They filed joint Federal income tax returns for the years 1966, 1967, and 1968 with the district director of internal revenue at Phoenix, Ariz.

M. Seth Horne (herein called petitioner) is a real estate developer and investor. He became interested in the field when trying to start up a restaurant in the Washington, D.C., area. Near the end of World War II, he surveyed the real estate business prospects in that area and began development operations on a full-time basis.

In 1947, petitioner was joined by Harold A. Naisbitt, an accountant, in a joint venture for the development of a piece of property in Fairfax County, Va. About 2 years later, W. B. Ingersoll, a practicing dentist, purchased a part of petitioner's interest in the joint venture. On January 5, 1951, Horne, Ingersoll, and Naisbitt formed a general partnership (herein called HIN or the partnership) to engage in the business of real estate development. Petitioner had a 65.6-percent interest in the partnership; Ingersoll had a 20-percent interest; and Naisbitt had a 14.6-percent interest. Petitioner acted as general manager, Naisbitt handled the accounting problems, and Ingersoll was available for consultation. So long as petitioner was a partner in HIN, he did not engage in any other business activities on a strictly individual basis. Although he owned certain rights concerning real property in his own name (as recited in the indemnity agreement detailed below), he owned them in conjunction with his partners. Nevertheless, due to his participation in HIN, he remained in the real estate business.

The business activities of the partnership consisted of acquisition, zoning, financing, and management of real properties. Its first large-scale project was an apartment complex and shopping center situated on 100 acres near Seven Corners, Va.[1]

James Stewart & Co., Inc. (herein called COINC), is a corporation organized under the laws of the State of New York in 1913. It conducted a general engineering and contracting business; and by 1951 it had acquired a respected international reputation. In 1927, COINC

---

[1] The partnership's returns for 1952 and 1953 state that its principal business activity was the renting of business furniture. Its returns for 1954 through 1960 state that its principal business activity was the performance of executive services for COINC, discussed in the text below. These statements are obviously not controlling. Furthermore, respondent apparently does not object to petitioner's characterization of the partnership's business as real estate development.

caused James Stewart Corp. (CORP) to be organized pursuant to the laws of the State of Delaware. CORP operated as a wholly owned subsidiary of COINC. It, too, performed general engineering and contracting work.

In 1951, soon after the formation of HIN, the petitioner and his partners became interested in acquiring COINC, thinking that COINC's construction activities would complement the partnership's real estate activities. On January 1, 1952, they purchased all of the common stock of COINC, consisting of 12,168 shares, and 2,055 shares of preferred stock for a total of $150,000. Later, on December 31, 1954, they purchased the remaining 4,533 shares of preferred stock for an additional $150,000. After an adjustment due to taxes assessed against COINC, the total purchase price for both common and preferred stock amounted to $246,406.25. All stock was acquired in the names of the individual partners according to each partner's interest in HIN. Petitioner's basis in the COINC stock was $194,442.50.

On July 28, 1952, COINC—then controlled by petitioner and his partners in HIN—caused James Stewart Co. (CO) to be incorporated under the laws of the State of Texas. Like CORP, CO was COINC's wholly owned subsidiary and performed construction and general contracting work. The plan was for COINC to base its operations in New York and perform contracts in the Eastern States, for CORP to base its operations in Chicago and perform contracts throughout the Midwest, and for CO, based in Texas, to service the western part of the country.

From the start petitioner, Ingersoll, and Naisbitt were active in the management of COINC as members of its board of directors. Also, petitioner was immediately made vice president of COINC. He held that office until 1955, when he was elevated to president and chairman of the board—positions which he held through 1960. Petitioner and Naisbitt were also members of the board of both CORP and CO. In 1953, petitioner was elected vice president of CORP and, in 1954, chairman of its board. Petitioner was president of CO from its inception.

As for the relationship between the partnership and the corporations, HIN was the manager of COINC, and CORP and CO were its operational arms. HIN engaged in all phases of real estate development—though after acquiring COINC, a great deal of the partners' time was devoted to overseeing the parent and its subsidiaries. The corporations only performed construction work, except CO developed some land on the Papago Indian Reservation (Papago Indian Project), near Sells, Ariz., and some mining claims near Tombstone and Camp Verde, Ariz.

For the years 1953 through 1960, the net income of COINC, CORP, and CO, exclusive of any net operating loss deductions, was as follows:

| Year | COINC | CORP | CO |
|------|-------|------|-----|
| 1953 | $32,554.97 | $8,707.20 | $33,773.99 |
| 1954 | 9,391.29 | 121,644.15 | (52,543.84) |
| 1955 | 36,723.78 | 19,567.59 | (77,982.91) |
| 1956 | 38,379.79 | 236,126.55 | 13,621.82 |
| 1957 | 84,020.79 | 69,316.32 | 98,356.31 |
| 1958 | (122,994.30) | (329,306.37) | (230,013.29) |
| 1959 | (39,547.41) | (10,474.26) | (165,019.40) |
| 1960 | (75,967.18) | (138,196.22) | (159,282.89) |

During the years 1952 through 1960, petitioner received no compensation of any kind from COINC, CORP, or CO for services rendered. Nor did Ingersoll or Naisbitt receive any compensation. Also, none of the corporations paid any dividends during those years. CORP and CO did, however, pay management fees to COINC, and COINC in turn paid management fees to the partnership. The following schedule shows the fees paid by COINC to HIN:

| Year | Management fee | Year | Management fee |
|------|----------------|------|----------------|
| 1952 | $28,801.63 | 1957 | $61,303.94 |
| 1953 | 33,499.92 | 1958 | 50,000.00 |
| 1954 | 55,500.00 | 1959 | 55,000.00 |
| 1955 | 50,000.00 | 1960 | 51,001.10 |
| 1956 | 50,000.00 | | |

The partnership was operated on the accrual basis of accounting and used the calendar year as its taxable year. Its Federal income tax returns for the years 1952–60 reveal the following:

| Year | Total income | Total deductions | Petitioner's share of ordinary income [1] | Petitioner's share of capital gains [2] | Payments from partnership to petitioner |
|------|-------------|------------------|------------------|-------------------|------------------|
| 1952 | $77,832.21 | $57,903.42 | $5,937.29 | $871.73 | |
| 1953 | 93,350.19 | 71,834.25 | 5,484.86 | (506.37) | |
| 1954 | 104,044.67 | 72,945.84 | 11,541.63 | 1,574.40 | |
| 1955 | 108,690.02 | 130,835.61 | (14,527.50) | 9,534.82 | $16,200.00 |
| 1956 | 191,988.41 | 132,255.45 | 39,184.82 | 12,262.49 | 20,700.00 |
| 1957 | 126,814.85 | 114,677.50 | 6,541.17 | 12,262.49 | 26,492.85 |
| 1958 | 84,000.00 | 119,008.29 | (37,999.98) | 14,633.96 | 23,200.00 |
| 1959 | 131,072.27 | 100,837.19 | 19,834.21 | 122,590.14 | 3,803.37 |
| 1960 | 156,124.04 | 116,322.48 | 26,109.80 | 56,565.76 | 17,795.60 |

[1] After payments to partners.
[2] Including sec. 1231 gains.

In the conduct of their construction business the three corporations were required to furnish performance bonds on the jobs that they undertook. All three corporations obtained bonds from New Amsterdam Casualty Co. (herein called New Amsterdam or the bonding company). COINC and CORP agreed to indemnify New Amsterdam for any losses incurred as surety for CO; CORP and CO agreed

to indemnify New Amsterdam from any losses incurred as surety for COINC.

Beginning in 1958 and continuing through 1960, the corporations suffered financial losses; by October 1960 they were in severe financial trouble. For its taxable year ended December 31, 1960, CO had a net operating loss of $539,090.21, inclusive of a net operating loss carryover of $379,807.32. CO's difficulties were due to losses incurred in connection with construction work in Southern California and the Papago Indian Project. In all, CO's net worth was adversely affected by approximately $1.75 million.

As a consequence of the above difficulties, in the summer of 1960, petitioner and Naisbitt notified New Amsterdam that CO could not complete all its contracts and that it, as surety, would probably have to make some performance in accordance with the bonds written on CO's behalf. They also informed New Amsterdam that COINC and CORP did not have sufficient funds to meet their obligations as indemnitors under the cross-indemnity agreements. At this point, the bonding company estimated its "exposure" at approximately $1.2 million. Also at this point in time none of the partners in HIN, including the petitioner, were individually liable to the bonding company for amounts paid on performance bonds.

To better secure itself, New Amsterdam requested petitioner, Ingersoll, and Naisbitt to contract to indemnify it for any loss incurred on the three corporations' bonds. Ingersoll and Naisbitt balked. Petitioner, however, acceded. He did so realizing that unless he agreed the corporations would be taken over by the bonding company, their assets would be liquidated, and they would probably end up in bankruptcy. Not only would he lose his investment in COINC but, most importantly, his credit reputation would be ruined. Thus, because the ability to borrow large amounts of money is crucial to the conduct of a real estate development business, he could no longer participate in such a business—on an individual basis or as a major figure in a partnership or corporation.

Negotiations between petitioner and New Amsterdam concerning the terms of the indemnity agreement commenced in October 1960 and continued until January 20, 1961, when an agreement was signed. Naisbitt participated in the early stages of the negotiations in order to help effectuate the separation of his and Ingersoll's affairs from the affairs of the petitioner. Sometime before January 20, 1961, the petitioner began the process of acquiring clear title to a tract of land (the Shirley Highway Property) of "very great value." The land is

located on Shirley Memorial Highway in the City of Alexandria, Va. It was being acquired "out of the partnership." [2]

Meanwhile, on November 16, 1960, New Amsterdam instituted a suit against CO and Mayer Central Building Corp. in the U.S. District Court for the District of Arizona asserting, among other things, that it, New Amsterdam, was not liable on bonds executed in connection with a contract between CO and Mayer.

The January 20 indemnity agreement between petitioner and New Amsterdam, recites as follows: That CO entered into eight construction contracts, including the Mayer Central Building Corp. contract, for a total contract price of approximately $12 million and that New Amsterdam was surety on those contracts; that, in addition, New Amsterdam was surety on the Papago Project, that claims had been and would be made against New Amsterdam on its bond, and that those claims would exceed $500,000; that COINC had previously agreed to act as indemnitor of New Amsterdam for losses sustained as surety for CO, that CORP had previously agreed likewise, that CORP and CO had previously jointly and severally agreed to act as indemnitor of New Amsterdam for losses sustained as surety for COINC, and that CO had previously agreed to act as indemnitor of New Amsterdam for losses sustained as surety for it, CO; that CO and CORP were both wholly owned subsidiaries of COINC and that petitioner, Ingersoll, and Naisbitt were the sole shareholders of COINC; that New Amsterdam had filed the above-mentioned suit against CO and Mayer Central Building Corp.; that the petitioner was "in the process of acquiring" clear title to the Shirley Highway Property; that CORP presently held certain rights under an agreement to purchase certain mining claims (the Charleston Claims); that petitioner, Ingersoll, Naisbitt, and COINC, together with another individual, presently held interests in certain rights under an agreement to purchase agriculture lease rights in property located in Yuma County, Ariz. (the Hall-Morrison Property); that petitioner, Ingersoll, Naisbitt, and COINC, together with another individual, presently owned certain real property and held certain interests in grazing lands (collectively referred to as the Palomas Ranch Property) and that said property was subject to a mortgage; that CO presently held certain rights under a joint venture agreement with Freesh Land Ventures, Inc., in land (the Papago Farm Property) owned by the Papago Indian Tribe; and that CO presently held a lease of mineral rights in Yavapai County, Ariz. (the Sodium Sulfate Mine Property), and an option involving said property.

---

[2] The details of this transaction are unclear. It appears, however, that the land was held in cotenancy by the petitioner, Ingersoll, and Naisbitt, and that petitioner was in fact acquiring title from them.

The indemnity agreement further provides, in summary, as follows:

1. The petitioner will obtain clear title to the Shirley Property and convey it to a trustee, the Mount Vernon Bank & Trust Co. of Fairfax County, Va., to be held as security for his promise to indemnify New Amsterdam.

2. Petitioner and CO will cause CORP to convey to CO CORP's rights to and interest in the Charleston Claims.

3. Petitioner and CO will cause COINC to convey to CO CORP's rights to and interest in the Hall-Morrison Property and the Palomas Ranch Property, plus (1) any amounts due from New Amsterdam to COINC for past services rendered [3] and (2) a life insurance policy on petitioner's life, naming COINC as beneficiary (petitioner and CO agreed to pay all premiums as they became due and to designate New Amsterdam as the new beneficiary).

4. Upon receiving the assets named in 2 and 3 above, CO will transfer such assets to a trustee, a Phoenix law firm, so as to secure CO's promise to indemnify New Amsterdam.

5. CO will endorse and deliver to New Amsterdam two promissory notes executed by one Lawrence D. Mayer and his wife Pauline, each in the sum of $50,000.

6. CO will assign all balances due and to become due on the eight construction contracts recited above; then, after all of the above,

7. New Amsterdam will dismiss with prejudice the action against CO and Mayer Central Building Corp.

8. New Amsterdam will fulfill the obligations of CO in connection with the eight construction contracts recited above, in accordance with its obligation as surety.

9. New Amsterdam will release COINC and CORP from their cross-indemnity agreements.

10. New Amsterdam will release CO and CORP from their cross-indemnity agreement, except as to five bonds executed in connection with five contracts, none of which are included among the eight construction contracts recited above.

11. CO and petitioner jointly and severally agree to pay to New Amsterdam (1) amounts expended by New Amsterdam pursuant to bonds issued in connection with the eight contracts recited at the beginning of the agreement, (2) all amounts for which CO is obligated under its separate indemnity agreements,[4] and (3) interest on all of said amounts at the rate of 4 percent per annum.

---

[3] Evidently, COINC occasionally helped in the performance of contracts taken over by New Amsterdam, as surety, from other construction companies.

[4] This apparently includes amounts expended pursuant to the bond issued in connection with the Papago Indian Project.

12. All amounts due from CO and petitioner on the above indemnity obligation will be paid in five semiannual installments, beginning 5 years after the date of this agreement.

Prior to the signing of the January 20 indemnity agreement, but contemporaneous with the negotiation of the agreement, the partners of HIN agreed, first, to dissolve [5] the partnership and distribute certain properties "owned by the partnership" to the individual partners in accordance with the following schedule:

| Property | Percentage interest distributed to: | | |
|---|---|---|---|
| | Petitioner | Ingersoll | Naisbitt |
| 1. Esso Station land at NE corner of Patrick Henry Dr. and Arlington Blvd., Fairfax Co., Va | 65. 6 | 20. 0 | 14. 4 |
| 2. Hot Shoppe land at SE corner of Patrick Henry Dr. and Arlington Blvd., Fairfax Co., Va | 65. 6 | 20. 0 | 14. 4 |
| 3. Foster Tract between Arlington Blvd. and South St., Fairfax Co., Va | 65. 6 | 20. 0 | 14. 4 |
| 4. Parcel 7 of Willston South, at SW corner of Patrick Henry Dr., and Arlington Blvd., Fairfax Co., Va | 65. 5 | 20. 0 | 14. 4 |
| 5. Parcel 8 of Willston South, Fairfax Co., Va | 18. 0 | 47. 5 | 34. 5 |
| 6. Medical Clinic land, Houston, Tex | 65. 6 | 20. 0 | 14. 4 |
| 7. Mohave Property, Mohave Co., Ariz | 100 | | |
| 8. Palomas Ranch Property, Yuma and Maricopa Counties, Ariz | 100 | | |
| 9. Eagle Tail Ranch, Yuma and Maricopa Counties, Ariz | 100 | | |
| 10. South Phoenix Property, Phoenix, Ariz | 100 | | |
| 11. Casa Grande Property, Pinal Co., Ariz | 100 | | |
| 12. Arizona Land Title Bldg., Tucson, Ariz | 100 | | |

Second, the petitioner, Ingersoll, and Naisbitt exchanged interests in certain parcels of land, including those six parcels listed above as not owned 100 percent by petitioner. Petitioner gave up his interest in part of the "Esso Station land" and in three tracts near land owned by Naisbitt off Arlington Boulevard in Fairfax County, Va.[6] In return, petitoner received the interests of Ingersoll and Naisbitt in the remaining portion of the "Esso Station land," the "Hot Shoppe land," the "Foster Tract," "Parcel 7 of Willston South," "Parcel 8 of Willston South," the "Medical Clinic land," and the "Shirley Highway Property." Both the dissolution/distribution and the exchange of interests occurred pursuant to agreements dated January 1, 1961.

Shortly after the signing of the January 20 indemnity agreement, the petitioner, Ingersoll, and Naisbitt agreed to a separation of CO from COINC and CORP. The petitioner received all the stock in CO—heretofore held by COINC, which was in turn owned by all three of the partners. Ingersoll and Naisbitt were left with all the stock in COINC and thus with the ownership of both COINC and CORP. As a part of this "settlement," the following assets, worth at least $555,000, were transferred from COINC and CORP (through

---

[5] While we note that the pertinent agreement is titled "Memorandum Agreement of Partial Liquidation of Partnership Assets," we accept the parties' characterization of this event as a complete dissolution of the partnership.

[6] The three tracts apparently did not come out of the partnership.

COINC) to CO: The Papago Farms Property, the Palomas Ranch Property, the Hall-Morrison Property, the Charleston Claims, a life insurance policy on petitioner's life, and accounts receivable due from New Amsterdam. In return, COINC received additional stock in CO. Evidently these shares, in addition to all other shares of CO stock held by COINC, were distributed to petitioner in redemption of his shares in COINC. This separation was effective as of December 31, 1960, though not agreed to until January 26, 1961. After the separation there were virtually no assets left in COINC and CORP, and both companies became inactive. Ingersoll and Naisbitt terminated their relationship with CO, and petitioner resigned his offices with COINC and CORP.

After the execution of the indemnity agreement, CO went about its construction business. Petitioner directed the affairs of the company as its president and principal managing officer. During each of the years 1961, 1962, and 1963, he received $12,000 per year in salary. For 1964, 1965, and 1966 he received no salary. In 1967 he received a salary of $9,500. Petitioner's wife received $4,800 as salary in 1963.

As of January 1, 1960, CO was, however, insolvent in that liabilities exceeded assets by approximately $530,000, and the company was unable to meet its debts as they matured. At the end of calendar year 1962, CO had a net operating loss of $677,000. Since CO had income amounting to $457,000 in 1964, this loss was carried forward.

In accordance with the bonding arrangement and its agreement with petitioner and CO, New Amsterdam made payments on behalf of CO. Although New Amsterdam originally anticipated having to pay out $1 to $1.5 million, the total amount of the payment was not determined until 1964 or 1965. Ultimately it paid out only $597,430.44.

Petitioner, pursuant to the January 20 indemnity agreement, paid the following amounts to New Amsterdam: $237,434.46 in 1966, $121,749.22 in 1967, and $238,246.76 in 1968. The money came in large part from the sale of the Shirley Highway Property in 1964. Petitioner then deducted one-half of these amounts, that is, $118,717, $60,875, and $119,123, in 1966, 1967, and 1968, respectively, as "losses pursuant to Indemnity Agreement of 1/20/61." The remaining halves were treated as loans to CO by petitioner and as accounts payable by CO.[7]

In 1963, petitioner organized the Seth Horne Development Corp. under the laws of the State of Arizona to perform real estate develop-

---

[7] At first, in 1966, CO treated the entire amount paid by the petitioner to the bonding company during that year (i.e., $237,434.46) as paid-in capital. This was corrected the next year, so that one-half of the amount paid to the bonding company was treated as paid-in capital and one-half as an account payable.

ment work. In March 1967, CO was merged into Seth Horne Development Corp., and the latter adopted the former's name—James Stewart Co. (We will refer to this Arizona version of CO as CO(ARIZ).) At all pertinent times the petitioner was the majority shareholder of CO(ARIZ).

The total assets, liabilities, capital, and surplus (or deficit) of CO and its successor, CO(ARIZ), as of 1960 through 1967 as reflected in its returns, were:

|  | 12/31/60 | 12/31/61 | 12/31/62 | 12/31/63 [1] |
|---|---|---|---|---|
| Total assets | $947,212 | $1,651,782 | $1,761,341 | $3,591,409 |
| Total liabilities | $1,479,531 | $1,675,044 | $1,876,291 | $3,162,935 |
| Capital stock | 25,000 | 580,000 | 580,000 | 580,000 |
| Paid-in capital | | | | |
| Surplus (deficit) | (557,319) | (603,262) | (694,950) | (151,526) |
| Total liabilities and capital | 947,212 | 1,651,782 | 1,761,341 | 3,591,409 |

|  | 12/31/64 | 12/31/65 | 12/31/66 | 12/31/67 |
|---|---|---|---|---|
| Total assets | $2,825,849 | $2,772,814 | $2,779,001 | $3,663,941 |
| Total liabilities | $2,568,189 | $2,357,178 | $1,975,541 | $3,042,209 |
| Capital stock | 580,000 | 580,000 | 580,000 | 605,000 |
| Paid-in capital | | | 237,434 | 179,592 |
| Surplus (deficit) | (322,340) | (164,364) | (13,974) | (162,860) |
| Total liabilities and capital | 2,825,849 | 2,772,814 | 2,779,001 | 3,663,941 |

[1] Per amended return.

The increase in capitalization from $25,000 to $580,000 reflects the treatment of the transfer of assets from COINC to CO as a purchase of additional shares.

Stewart-Southern, Inc. (Southern), was a California corporation which was organized in 1955 and, in 1961, was owned 50 percent by petitioner, his relatives, and his friends (the Horne group) and 50 percent by outsiders. In August 1961, CO purchased the stock of the Horne group in Southern for $441,303.75. In March 1963, CO bought the remaining stock for approximately $450,000. On June 14, 1963, Southern was liquidated and its assets transferred to CO. By far the most important of these assets was a piece of property in San Diego, Calif., known as the Rose Canyon Warehouse, having a book value in excess of $2 million. Also in June 1963, CO gave to petitioner a fourth mortgage on the Rose Canyon Warehouse.[8] It was provided, however, that the mortgage would be null and void if the mortgagor, CO, paid New Amsterdam the sum of $404,144 according to the terms and

---

[8] The three prior mortgages existed as follows: The first mortgage, dated Sept. 1, 1957, was executed in favor of the Bank of America Trust & Savings Association to secure payment of promissory notes totaling $3,500,000. It is not known to what extent these notes were paid. The second mortgage, dated Mar. 28, 1963, went to the "outsiders," the former owners of 50 percent of Southern, to secure payment of three purchase notes amounting to $750,000, exclusive of interest. The third mortgage, dated June 4, 1963, went to the Horne group in connection with the purchase of Southern to secure payment of notes worth $441,303.75.

conditions of the indemnity agreement between petitioner and New Amsterdam.

At this time, June 1963, a costly suit of the Papago Indian Tribe was threatened against CO. The reason for giving the fourth mortgage to petitioner was to protect the property from execution in the event a future lawsuit was lost.

The merger agreement between CO and Seth Horne Development Corp., leading to the creation of CO(ARIZ), provided, among other things, for the petitioner to be compensated for the release of the fourth mortgage by the receipt of additional shares in Seth Horne Development Corp. (soon to be CO(ARIZ)). A release was necessary in order to obtain refinancing on the property. The mortgage was released on or about June 30, 1967. At that time there remained less than $450,000 of indebtedness on the Rose Canyon Warehouse.

At all times from 1966 to 1968, CO and its successor, CO(ARIZ), had a net worth in the accounting sense (excess of assets over liabilities) of over $600,000, and in 1971 its net worth was approximately $5 million.

Respondent disallowed the claimed losses with this explanation:

The deductions of $118,717.00, $60,875.00, and $119,123.00 which you claimed for the taxable years 1966, 1967 and 1968 respectively as indemnity loss resulting from transfers of those amounts to the New Amsterdam Casualty Company for or on behalf of The James Stewart Company, [CO] * * * are disallowed. It is determined that the funds transferred represented contributions to capital rather than losses incurred in a transaction entered into for profit. If, however, it is found that such transfers were loans, it is determined that a bad debt deduction is not allowable under Section 166 of the Internal Revenue Code because it has not been established that the debt became worthless in the taxable year in which the deduction was claimed. If, however, it is found that such transfers were loans which became worthless in the taxable year in which the deduction was claimed, it is determined that the debt was a non-business bad debt since the debt was a personal loan and was not created in connection with your trade or business. In the latter event, the losses of $118,717.00, $60,875.00 and $119,123.00, respectively, are subject to the limitations of Section 1211 of the Internal Revenue Code.

OPINION

In late 1960 the petitioner, Seth Horne, held a majority interest in a three-man partnership, HIN. Petitioner also held interests in the Shirley Highway Property, the Hall-Morrison Property, and the Palomas Ranch Property. The three partners, as individuals, owned all the stock of COINC, in proportion to their respective interests in HIN. COINC, in turn, owned two subsidiaries, CORP and CO. CORP and CO paid management fees to COINC, and COINC paid management fees to HIN. The principal business of HIN was the

holding and development of real estate, including the performance of construction jobs. Petitioner's business, as of 1960 and early 1961, was the same as that of the partnership.

Beginning in 1958 and continuing through 1960, the three corporations incurred large operating losses. For its taxable year ended December 31, 1960, CO alone had a net operating loss of $539,090.21, inclusive of loss carryovers.

In the summer of 1960, CO notified its bonding company, New Amsterdam, that it could not complete certain contracts and that the bonding company would have to step in. New Amsterdam, upon discovering that the three corporations were in severe financial trouble, asked the three stockholders of COINC to become personally liable for amounts paid on the surety bonds. Petitioner's fellow stockholders (and partners) refused. Petitioner, however, agreed to indemnify the bonding company in order to protect his credit reputation and thus his business as a developer.

It was then agreed among the parties—the petitioner, his partners, and the bonding company—(1) that petitioner would obtain clear title to the Shirley Highway Property and transfer it to a trust as security for his (the petitioner's) promise to indemnify New Amsterdam; (2) that COINC and CORP (through COINC) would transfer certain properties and accounts receivable having a fair market value in excess of $555,000 to CO; (3) that petitioner's stock in COINC would be completely redeemed in exchange for all the stock in CO; (4) that COINC, CORP, and the other two shareholders/partners would not be liable to New Amsterdam; (5) that petitioner would indemnify New Amsterdam. Among the partners it was also agreed that HIN would be dissolved; that certain properties would be distributed to the partners, who would then hold some properties as cotenants; and that they would exchange interests in those parcels held in cotenancy so that petitioner would own certain parcels "free and clear." All of the above was accomplished. Afterwards, the former partners went their separate ways. The petitioner rebuilt CO's construction business and, when the losses on the bonds were established, reimbursed New Amsterdam. Upon the advice of counsel the petitioner treated one-half of his indemnity payments as loans due from CO and one-half as ordinary losses. He has collected some money from CO, but not yet one-half of the amounts paid. The Commissioner disallowed the claimed loss deductions.

The petitioner, through his able counsel, takes a shotgun approach. He contends that the amounts in question are deductible under section 165(c) (1) and (2) or, alternatively, under section 212 or, perhaps

more appropriately, under section 162. He argues that section 166, *Putnam*,[9] and *Generes*[10] are inapplicable.

Respondent argues as follows: First, the losses on the indemnity agreement are part of the purchase price of CO's stock. Second, the petitioner suffered no losses. He was adequately compensated for the indemnity payments that he made. Third, if the losses are deductible at all, they are deductible only under section 166. He contends that the petitioner must lose under section 166, however, because the debts in question are not worthless. Finally, he claims that if the debts are worthless, they are nonbusiness rather than business bad debts.[11]

To begin with, we disagree with respondent that the losses on the indemnity agreement must be treated as a part of petitioner's basis in the CO stock. While the facts of the sorting-out process which followed the corporations' financial crisis are somewhat confusing, we are convinced, after carefully reviewing them, that petitioner's promise to indemnify New Amsterdam was not partial consideration for the subsidiary's stock, which Naisbitt and Ingersoll agreed would be transferred from COINC to petitioner in exchange for petitioner's COINC stock. Naisbitt and Ingersoll were never personally liable to New Amsterdam as indemnitors or guarantors of any of the corporations' debts; therefore, the exchange of stock was not conditioned on petitioner's indemnity promise as consideration for New Amsterdam's promise to release Naisbitt and Ingersoll. In other words, there was no three-way agreement. Also Naisbitt and Ingersoll were not purchasing the release of COINC and CORP from their cross-indemnity agreements. It is apparent that both corporations, after having transferred their assets to CO, would be abandoned. Furthermore, there is no indication that New Amsterdam insisted upon the reorganization (petitioner did this) or that the transfer of assets from COINC and CORP to CO depended upon petitioner's entering into the agreement. Cf. *Estate of McGlothin* v. *Commissioner*, 370 F. 2d 729 (C.A. 5, 1967), affirming 44 T.C. 611 (1965); *Albert J. Harvey, Jr.*, 35 T.C. 108 (1960).

In *Estate of McGlothin* v. *Commissioner, supra*, the taxpayer, a stockholder of P corporation, guaranteed the market value of certain

---

[9] *Putnam* v. *Commissioner*, 352 U.S. 82 (1956).

[10] *United States* v. *Generes*, 405 U.S. 93 (1972).

[11] The tax consequences of the corporate reorganization are not directly at issue in this case.

Respondent does not argue that the losses, if allowed, are capital losses because they are an outgrowth of the earlier, essentially capital transaction. See *Arrowsmith* v. *Commissioner*, 344 U.S. 6 (1952); *Wener* v. *Commissioner*, 242 F. 2d 938 (C.A. 9, 1957); *Rees Blow Pipe Manufacturing Co.*, 41 T.C. 598 (1964), affd. 342 F. 2d 990 (C.A. 9, 1965). Nor does he argue that the indemnification of the bonding company and the losses pursuant thereto represent some sort of unusual contribution to capital. See *J. Meredith Siple*, 54 T.C. 1 (1970), and cases cited therein.

assets owned by P as part of a merger between another corporation and P. His losses on the guaranty were treated as capital expenditures. There it was found that the guaranty agreement was a critical condition necessary for the acquisition of the other corporation's stock by the taxpayer. Here we find, to the contrary, that the indemnity agreement, though contemporaneous with, was not consideration for, the stock received in the reorganization.

The case of *Albert J. Harvey, Jr., supra,* is even farther afield. In *Harvey,* the taxpayer was an employee, director, and major shareholder of H&O corporation. H&O being in need of funds, the taxpayer requested a friend to personally guarantee a loan from a bank to H&O. In consideration for the friend's guaranty, all the shareholders, including the taxpayer, transferred one-half of their stock to the friend. The taxpayer then agreed to indemnify the friend against any loss by reason of the latter's guaranty of the loan. In consideration for this agreement to indemnify, the friend assigned to the taxpayer all the H&O stock which he, the friend, had previously acquired in return for his guaranty. H&O went bankrupt; the friend paid off on his guaranty; and the taxpayer paid the friend in accordance with the indemnity agreement. On these facts we held that the losses on the indemnity agreement were part of the purchase price of the stock received from the friend:

The net effect of the entire transaction * * * was that petitioner, being a substantial shareholder and director of H & O, was able to obtain additional funds for H & O by pledging his property and in return he received stock of H & O. In substance, this transaction constitutes an acquisition of H & O stock by petitioner for his guaranty of the H & O loan. * * *

* * * * * * *

Petitioner, by his indemnity agreements, assumed a contingent liability and thus acquired the H & O stock without making any immediate payment therefor. [*Albert J. Harvey, Jr., supra* at 112–113.]

We find no such tic-for-tac consideration in this case.

We also disagree with the contention that petitioner was adequately compensated by CO for the amounts paid on the indemnity agreement and that, therefore, he suffered no losses. Respondent points to the fact that in 1963 petitioner was given a fourth mortgage on a warehouse in southern California. Later, the petitioner released the mortgage in order to help CO's successor obtain financing, receiving in return additional shares in the successor. Petitioner's explanation is that the fourth mortgage was of indeterminable value and was given simply to further protect the property from execution in connection with a foreseeable lawsuit. The facts are laid out in sufficient detail in our Findings of Fact. Because we believe the testimony given on petitioner's behalf,

we find that the fourth mortgage was not compensation for petitioner's indemnity losses.

Turning to the sections of the Code argued by the parties, we think it best to proceed section by section.

*Section 162.*—Section 162 (a) allows a deduction for all the ordinary and necessary expenses paid or incurred in carrying on any trade or business. For this section to be applicable to these facts the petitioner must show, among other things, that he was in a business—herein the real estate development business—to which the payments might "proximately" relate, that the payments were not *Welch* v. *Helvering* [12]-type capital payments made to purchase a good name, and that he did not stand as a creditor in relation to his principal, CO, after making payment. Although respondent attempts to characterize petitioner's business as that of a corporate executive and points to testimony to the effect that petitioner did not engage in any business on an individual basis so long as he was a member of HIN partnership, the partnership's business and hence, in this case, the petitioner's business was real estate development—from acquisition of land, to construction of improvements, to management of the property. Since he was in the real estate development business before undertaking the indemnity liability and remained in that business thereafter, the disputed amounts cannot be said to be capital expenditures to acquire goodwill. Compare *Welch* v. *Helvering*, 290 U.S. 111 (1933) ; *Falstaff Beer, Inc.* v. *Commissioner*, 322 F. 2d 744 (C.A. 5, 1963) ; *Carl Reimers Co., Inc.* v. *Commissioner*, 211 F. 2d 66 (C.A. 2, 1954), with *Samuel R. Milbank*, 51 T.C. 805 (1969) ; *L. Heller & Son, Inc.*, 12 T.C. 1109 (1949) ; *Scruggs-Vandervoort-Barney, Inc.*, 7 T.C. 779 (1946) ; *Edward J. Miller*, 37 B.T.A. 830 (1938). The question which remains is whether upon payment to the bonding company in fulfillment of the indemnity agreement, petitioner became entitled to reimbursement from CO or, restated, whether the *Putnam* case and section 166 apply. The answer would ordinarily lie in State statutory or case law. *Santa Anita Consolidated, Inc.*, 50 T.C. 536, 559–560 (1968). See also *Putnam* v. *Commissioner*, 352 U.S. 82 (1956) ; *Bert W. Martin*, 52 T.C. 140, 143 (1969), affirmed per curiam 424 F. 2d 1368 (C.A. 9, 1970). In this case, however, the parties have not cited, and we have not discovered, any dispositive Arizona law. Nevertheless, upon consideration of the general case law, treatises, and restatements, we conclude that the correct answer is that the petitioner was actually both an indemnitor *and* a guarantor; that he did acquire a "remedy over" against CO, his and the bonding company's principal, and that this "remedy over" represents a debt falling within the provisions of section 166. See *United States* v. *Hoffman*, 423 F. 2d

---

[12] *Welch* v. *Helvering*, 290 U.S. 111 (1933).

1217 (C.A. 9, 1970), for the proposition that an indemnitor in a four-party indemnity situation is to be treated the same as a guarantor. See generally, *United States* v. *Generes*, 405 U.S. 93 (1972) ; *Reid* v. *Pauly*, 121 Fed. 652 (C.A. 9, 1903).

A *guarantor* is one who promises either that another will perform his duty, or that, if another does not perform his duty, he will, non-performance by the other being a condition precedent to the guarantor's duty to pay. In the broader sense of the word "surety," a guarantor is also a surety; and, for the purposes of this discussion, an indorser is like a guarantor. An *indemnitor* is one who promises to hold another harmless from loss in respect to an obligation to a third person. "The great difference between the two [a guarantor and indemnitor] lies in the character of the promisee. In * * * [guaranty] the promise runs to an obligee * * *, present or prospective. In indemnity the promise runs to an obligor * * *, present or prospective." Simpson, Law of Suretyship 28 (1950). Whether a party is a guarantor or an indemnitor or both depends upon an analysis of the legal character of the actors and their obligations, not the terminology used. In the four-party indemnity situation, there is, for example, a principal-contractor, a creditor-obligee, a surety (or guarantor)-bonding company, and an indemnitor-shareholder. The principal owes the creditor-obligee money or, more likely, some type of performance. The surety (or guarantor) promises the creditor-obligee that he will pay or perform if the principal does not. Clearly, in relation to the creditor-obligee, the surety (or guarantor) is an obligor. As a guarantor, however, he is entitled as a matter of law to be reimbursed by his principal; in this respect, he is also an obligee. The indemnitor promises the surety (or guarantor) that he will secure him against any loss on his obligation to the creditor-obligee. In this light the indemnitor is a true indemnitor since his promisee, the surety (or guarantor), is an obligor. But his promisee is also an obligee, vis-a-vis the principal; and, in this other light, the indemnitor is also a guarantor, with all the rights and privileges of a guarantor. For instance, the so-called indemnitor in the four-party indemnity situation is entitled to subrogation to the rights of the surety (or guarantor) against the principal, i.e., any rights of the creditor-obligee against the principal acquired through subrogation and any right to reimbursement. "Much of the difficulty and confusion that exists in the cases in distinguishing between the contract of indemnity and the contract of suretyship [or guaranty] lies in the common failure to recognize the fact that the former is always accompanied by * * * the latter whenever the four-party indemnity situation is involved." Simpson, *supra* at 30; Restatement, Security, sec. 96. Thus, petitioner, the indemnitor in the above illustration, was as much a guarantor as an indemnitor. It is now well established that a guarantor, upon payment, stands in a

creditor-debtor relationship with his principal. In this particular case the petitioner was subrogated to the rights of the bonding company against the corporation, rights which the bonding company acquired through subrogation from the creditors for whose benefit the bonds were executed. It is equally well established that given such a creditor-debtor relationship, the guarantor, here the petitioner, must look to the bad debt provisions of section 166 for the deduction of related losses. And there is no doubt that the debt arising out of a guarantee that has been performed is a debt within the meaning of that term as used in section 166. *Putnam* v. *Commissioner, supra.*[13] See also *Robert E. Gillespie*, 54 T.C. 1025, 1031 (1970), and the cases cited therein.

In *United States* v. *Hoffman, supra*, the taxpayers, owners of an electric contracting corporation, had indemnified the bonding company which wrote bonds for the corporation and had had to make good. They claimed tax refunds for the amounts lost on the ground that these were losses deductible under section 165(c)(2). The District Court held for the taxpayers, stating (266 F. Supp. at 886):

> *Putnam* is not in point. Unlike *Putnam*, the Hoffmans were indemnitors. An indemnitor has a primary obligation to the creditor and he is not subrogated to the creditors' rights. See: Howell v. Commissioner of Internal Revenue, 8 Cir. 1934, 69 F. 2d 447.

The Court of Appeals for the Ninth Circuit reversed, relying upon *Stratmore* v. *United States*, 420 F. 2d 461 (C.A. 3, 1970), a case involving guarantors. "That the Stratmores were guarantors and the Hoffmans were indemnitors is not a persuasive distinction between the two cases." *United States* v. *Hoffman, supra* at 1218. The principal of *Putnam* was applied. Thus the *Hoffman* case treats indemnitors in a four-party situation like guarantors.

By far the most in-depth judicial discussion of the problem appears in Chief Judge Andrews' opinion in *Jones* v. *Bacon*, 40 N.E. 216 (N.Y. Ct. App. 1895), affirming 25 N.Y. Supp. 212 (1893). In that case the indemnitor promised to hold the plaintiff harmless if he, the plaintiff,

---

[13] The deduction for bad debts first appeared in the Act of Mar. 2, 1867, as an amendment to the Act of Mar. 3, 1865, ch. 78, 13 Stat. 471, 479, which in turn amended sec. 117 of the Act of June 30, 1864, ch. 173, 13 Stat. 223, 281. ("* * * and in addition to one thousand dollars exempt from income tax as hereinbefore provided. * * * debts ascertained to be worthless * * *.") In the Revenue Act of 1918, the deduction appeared in sec. 214(a)(7): "Debts ascertained to be worthless and charged off within the taxable year * * *." Revenue Act of 1918, ch. 18, 40 Stat. 1057, 1067. In connection with the 1918 provision, the following floor discussion took place:

"Mr. Graham of Illinois. How about losses caused by indorsements on accommodation paper? That is, where one signs as security for another and makes a loss in that way, does the bill take care of that, so that such a loss can be deducted?

"Mr. Kitchin. If he charges it off and does not hold the other man responsible for it, it can be deducted."

56 Cong. Rec. App. 678. The remaining history of the deduction up to and including sec. 23(k), I.R.C. 1939, is traced in fn. 9 of *Putnam* v. *Commissioner, supra* at 85.

would guarantee the debt of the principal to a bank. Upon the principal's default the plaintiff paid the required amount to the bank, released the principal, who was insolvent, and sued the indemnitor on the indemnity agreement. The indemnitor defended on the ground that the release defeated the plaintiff's right of action. The court so held, reasoning that but for the release, the indemnitor would have been subrogated to the rights of the indemnitee against his principal. The court said (40 N.E. at 216):

The indemnitor of the plaintiff, on restoring to him this sum in performance of the contract of indemnity, would be entitled to be substituted to the claim of the plaintiff against Kingsbury [the principal]. This stands upon the most obvious principles of natural justice. * * * There was no privity of contract between the indemnitor and Kingsbury, but there was between the plaintiff [the indemnitee-guarantor] and Kingsbury. On paying the plaintiff what he had been compelled to pay for Kingsbury, pursuant to the contract of indemnity, the indemnitor would stand as the equitable assignee of the plaintiff of the obligation of Kingsbury to him. * * *

See also *Aetna Casualty Co.* v. *Phoenix Co.*, 285 U.S. 209, 214 (1932).[14]

Since it is our view that a debtor-creditor relationship did arise, section 162 cannot apply. E.g., *Oddee Smith*, 55 T.C. 260, 267 (1970), remanded on another issue 457 F.2d 797 (C.A. 5, 1972); *Josef C. Patchen*, 27 T.C. 592, 600 (1956), affirmed in part and reversed in part on another issue 258 F.2d 544 (C.A. 5, 1958). See and compare *Samuel R. Milbank, supra*, where no debtor-creditor relationship arose.

*Section 165.*—Section 165(c) provides a deduction, in the case of individuals, for losses incurred in a trade or business or losses incurred in a transaction entered into for profit. This provision cannot be relied upon where section 166 is applicable. *Spring City Co.* v. *Commissioner*, 292 U.S. 182 (1934) (involving sec. 234(a)(4) and (5) of the Revenue Act of 1918, 40 Stat. 1077, predecessors of sec. 166 and 165); *Putnam* v. *Commissioner, supra* (decided under the Internal Revenue Code of 1939); *Inman-Poulsen Lumber Co.* v. *Commissioner*, 219 F. 2d 159 (C.A. 9, 1955) (also decided under the Internal Revenue Code of 1939).

*Section 212.*—Section 212 allows as a deduction all the ordinary and necessary expenses paid or incurred for the production or collection of income and for the management, conservation, or maintenance of

---

[14] Because of our choice as to the disposition of this case, we need not consider two other grounds for finding a creditor-debtor relationship between petitioner and CO. (1) It is argued that as a general rule indemnitors should be treated as guarantors for sec. 166 purposes. Compare *United States* v. *Hoffman*, 423 F. 2d 1217 (C.A. 9, 1970), and *Jones* v. *Bacon*, 40 N.E. 216 N.Y. (Ct. App. 1895), *supra*, with *Howell* v. *Commissioner*, 69 F. 2d 447 (C.A. 8, 1934). (2) It is argued that as a coindemnitor who was not directly benefited by the indemnification, the petitioner was entitled to 100-percent contribution from CO, the coindemnitor who was directly benefited, and that this represents a sec. 166 debt. But see *Security Insurance Co.* v. *Johns-Manville Sales Corp.*, 442 P. 2d 555 (Ariz. Ct. App. 1968), for an example of how difficult it is to weigh the equities in such a case.

property held for the production of income. Petitioner maintains that real estate development was his source for the production of income and that that source would have been impaired if he had not agreed to enter into the indemnity agreement with the bonding company. In addition, he says that his actions helped preserve CO, the property from which he derived his income. It is unnecessary to analyze these arguments in light of the facts since petitioner, whether he knew it or not, had a fixed, readily assertable right to payment by CO. This one fact alone makes section 212 inapplicable. *Estate of Elmer B. Boyd*, 28 T.C. 564, 566 (1957). Cf. *Electric Tachometer Corp.*, 37 T.C. 158 (1961).

*Section 166.*—Section 166(a) provides that there shall be allowed as a deduction any debt which becomes wholly worthless within the taxable year. Subsection (d) provides, with respect to nonbusiness debts, that any loss resulting therefrom shall be treated as a short-term capital loss. Paragraph 2 of subsection (d) states that "the term 'nonbusiness debt' means a debt other than—(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

As we have previously indicated, it is our opinion that this is basically a section 166 case. We might add that we do not think that petitioner should be viewed as a mere volunteer, nor that his right to payment by CO should be characterized as simply an unadjudicated claim. See and compare *Phillip H. Schaff*, 46 B.T.A. 640 (1942).

It is unnecessary for us to decide the question of whether the losses of the petitioner were business or nonbusiness bad debt losses because we find that the debts were not worthless in the year claimed. It appears from the testimony not only that some amounts—less than one-half the total amount—have been repaid, but also that CO was financially able to repay additional amounts. CO never went bankrupt. Indeed, in each of the 3 years before us, CO's net worth exceeded $600,000. The fact that there were operating losses does not contradict this conclusion. *Pachella's Estate* v. *Commissioner*, 310 F. 2d 815 (C.A. 3, 1962), affirming 37 T.C. 347 (1961). See *Higgenbotham-Bailey-Logan Co.*, 8 B.T.A. 566 (1927).

To reflect the conclusions reached herein,

*Decision will be entered under Rule 50.*