HAROLD KARP and SYLVIA R. KARP, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Karp v. Commissioner
Docket No. 6043-71.
United States Tax Court
T.C. Memo 1973-184; 1973 Tax Ct. Memo LEXIS 107; 32 T.C.M. (CCH) 867; T.C.M. (RIA) 73184; August 20, 1973, Filed Harold Karp, pro se. Thurmond E. Shaw, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' income taxes in the amounts of $1,617.15 and $559.20 for 1966 and 1967, respectively. The sole issue for decision is whether petitioners may deduct, as business bad debts under section 166(a), [1] as nonbusiness bad debts under section 166(d), or as worthless securities under section 165(g), *109 the amounts paid by petitioner Harold Karp in 1966 2 and 1967 in discharge of part of his obligation to repurchase certain worthless "Registered Subordinated Convertible Debentures." FINDINGS OF FACT Petitioners Harold Karp and Sylvia R. Karp are husband and wife and were legal residents of Atlanta, Georgia, at the time of filing their petition herein. Petitioners filed joint Federal income tax returns for 1966 and 1967 with the district director of internal revenue in Atlanta, Georgia. Harold Karp (hereinafter referred to as petitioner) has been engaged in the general practice of law in Atlanta since 1935. Robert L. Strauss (hereinafter Strauss) has been a close friend and client of petitioner's since 1944, and they have had business dealings since at least 1948 when petitioner made an investment of $10,000 in Ross Jewelers, Inc., a corporation controlled by Strauss. Subsequent to 1948 petitioner became nominal secretary of, and performed legal service for, numerous corporations formed by Strauss. Because of their friendship *110 and Strauss's high regard of petitioner's legal capabilities, Strauss recommended petitioner as a proficient attorney to his employees, business associates, and friends. Over the years a portion of petitioner's earnings from his law practice was 3 derived from Strauss-related business enterprises and friends of Strauss's. From the inception of his business relationship with Strauss, petitioner has often furnished funds to various corporations controlled by Strauss by writing checks or making deposits as Strauss directed. Sometimes after writing these checks, petitioner would receive in exchange therefor checks in the same amounts from Strauss-related corporations. If a corporation's check did not clear the bank, it was understood by Strauss that petitioner acquired a claim against the corporation for the amount of the check. Although this check-exchange practice resulted in substantial sums of money being loaned to Strauss's corporations, neither petitioner nor his law firm received any interest on such loans. From approximately 1956 to 1959, Strauss and his various enterprises were located in Miami, Florida, and no loans or check exchanges were made during this period. *111 During 1958 Strauss was the subject of a bankruptcy proceeding in the United States District Court for the Southern District of Florida. Petitioner filed two proofs of claim in that proceeding - one in the amount of $26,000 on his own behalf and one in the amount of $5,350 on behalf of his law firm. These claims were based on indebtedness resulting from check exchanges between petitioner and Strauss (or Strauss's 4 corporations) during the period beginning in 1948 and ending sometime in 1955 and 1956. Petitioner received nothing on either of these bankruptcy claims. Upon Strauss's relocation to Atlanta in 1959, petitioner's business relationship with him was renewed and continued much as before. In 1959 petitioner did the legal work for the organization of various real estate-holding corporations, which were controlled by Strauss, including United Southern Companies, Inc. (hereinafter USC). USC was a holding company for all of Strauss's other corporations. Petitioner was issued 75,000 shares of USC stock on May 9, 1961, but he held this stock as a nominee for Strauss. Petitioner served as a director of USC from sometime in October of 1961 until November 21, 1962. Strauss *112 held no office in USC and none of its stock was issued in his name. Up through December 30, 1960, petitioner and his law firm, or both, were still exchanging checks and making loans to USC and its subsidiaries. As before, these exchanges were made at Strauss's direction, but petitioner looked only to USC for payment of any check he or his law firm received in an exchange. At the end of 1960, USC was indebted to petitioner's law firm for a sum in excess of $50,000 as a result of check exchanges. As was the case during the 1948-to-1956 period, petitioner received no interest or other profits directly attributable to these loans, and petitioner did not 5 consider himself to be in the trade or business of lending money. In 1960 USC was financially overextended and, in order to satisfy its need for additional capital, began issuing debentures. USC eventually sold several hundred thousand dollars of these debentures. Under an agreement between the Empire Insurance Company of South Carolina and USC, the insurance company guaranteed payment of each debenture, subject to a maximum payment of $10,000 per holder, plus applicable interest. Because USC did not have the cash to pay *113 the check-exchange debt owing to petitioner, on or about December 31, 1960, at Strauss' suggestion, USC issued in the name of petitioner's law firm 56 (or 60) of the company's 7 percent "Registered Subordinated Convertible Debentures," each having a face value of $1,000. The debentures were issued in cancellation of USC's check-exchange debt to petitioner. Although USC was using salesmen to sell the debentures, in petitioner's case the debentures were issued directly to his law firm so that petitioner could sell the debentures himself without paying sales commissions. In soliciting buyers, petitioner represented that he or his law firm owned the debentures and that the debentures had been delivered to his law firm in payment of loans made to USC. 6 During 1961 petitioner sold 36 of these debentures, 12 to each of three clients, for a total consideration of $30,600, each client-vendee paying $10,200 for debentures having a face value of $12,000. The payments were deposited in the bank account of petitioner's law firm. As part of each of two of the above-mentioned sales, petitioner executed an instrument in which he agreed to "repurchase" the debentures at the sales price, *114 plus interest, within 90 days of receiving written notice from the client-vendee. Each instrument further stated that the client-vendee's ownership of the debentures was unrestricted and that petitioner had no right to repurchase them unless the client-vendee requested in writing that he do so. The agreement issued to the third client-vendee contained basically the same provisions but called for repurchase of the debentures by petitioner upon his receipt of 6 months' written notice. USC executed six similar repurchase agreements covering six $1,000 debentures sold to one of the aforementioned client-vendees; these were the only agreements of this type executed by USC. In 1963, following a controversy with one of USC's biggest stockholders, USC redeemed the dissident stockholder's interest in exchange for a building, one of USC's 7 most valuable assets. The loss of this asset ultimately led USC to file a petition in the United States District Court for the Northern District of Georgia, Atlanta Division, for reorganization and relief under chapter X of the Bankruptcy Act, and such petition was granted. Petitioner and his law partner each filed a proof of claim in the amount *115 of $10,000 in the USC reorganization proceeding but received no payment thereon. These claims were based on 20 of the debentures issued by USC to petitioner's law firm, in addition to the 36 debentures mentioned above, in cancellation of the check-exchange debt owed the firm by USC. During 1966 and 1967 petitioner paid sums of $8,072 and $3,047, respectively, for the repurchase of USC debentures pursuant to the repurchase agreements executed for the benefit of petitioner's three client-vendees. In their 1966 and 1967 Federal income tax returns, petitioners deducted the amounts of $8,072 and $3,047, respectivley, as ordinary "guaranty" losses under section 166. In the statutory notice, respondent determined deficiencies based upon a finding that the losses were capital losses resulting from the worthlessness of debts evidenced by corporate securities, within the meaning of section 165(g). 8 OPINION Section 165 allows as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. A special class of loss deduction is carved out of section 165 and placed in section 166, which generally allows as a deduction any debt which becomes *116 worthless during the taxable year. Sections 165 and 166 are "mutually exclusive." Spring City Co. v. Commissioner, 292 U.S. 182, 189 (1934). Under the statutory scheme, "a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all." Putnam v. Commissioner, 352 U.S. 82, 88 (1956). Although section 166(a) provides a deduction for the full amount of any debt which becomes worthless during the taxable year, section 166(d) renders that provision inapplicable to nonbusiness bad debts. Section 166(d) (2) defines a nonbusiness debt to mean a debt other than (A) "a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer," or (B) "a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or busness." Losses attributable to nonbusiness debts are accorded the same treatment as losses on the sale or exchange of a capital asset held for not more than 6 months. 9 Under section 166(d), the character of a bad debt is determined by the relationship it bears to the taxpayer's trade or business. Only if the debt bears a proximate relationship *117 to the taxpayer's trade or business will it qualify for business bad debt status under section 166(a). Whipple v. Commissioner, 373 U.S. 193, 201 (1963); sec. 1.166-5(b), Income Tax Regs. And whether a bad debt has a "proximate" relation to the taxpayer's trade or business is measured by the "dominant motivation" of the taxpayer in creating the debt. United States v. Generes, 405 U.S. 93, 103 (1972). Section 166(e) makes the bad debt provisions of section 166 inapplicable to a debt which is "evidenced by a security as defined in section 165(g) (2) (C)." Section 165(g) (2) (C), in pertinent part, defines a security to mean a "debenture, * * * issued by a corporation * * * in registered form," and section 165(g) (1) accords capital loss treatment on such securities which become worthless during the taxable year. Within this framework, respondent argues that the debentures issued by USC superseded the check-exchange debt and thus made section 165(g) the controlling statute. In the event the check-exchange debt should be found to survive the issuance of the debentures, respondent argues 10 alternatively that the debt was a nonbusiness bad debt within *118 the meaning of section 166(d). Throughout the proceeding herein, petitioner has sought to justify his claim to an ordinary deduction in each year solely on the theory that the check-exchange loans led to business bad debts within the meaning of section 166(a) (1). Petitioner contends that the direct business and referrals received from Strauss were an important source of his legal work and that the loans made to Strauss-controlled corporations through check exchanges were proximately related to maintaining or increasing the income from his law practice, citing Stuart Bart, 21 T.C. 880 (1954), acq. 1954-1 C.B. 3; and Frank A. Garlove, T.C. Memo. 1965-201 (1965). Although petitioner's theory as to his outlays for the repurchase of the debentures is not clearly articulated, apparently he contends that these latter payments pursuant to the repurchase agreements are analogous to payments honoring a guaranty agreement, thereby giving rise to a right of subrogation against USC which was worthless at the time he made the repurchase payments. We hold, for two basic reasons, that the losses sustained by petitioner in connection with the USC debentures *119 are deductible only as nonbusiness bad debt losses under section 166(d) or as worthless securities losses under 11 section 165(g) (1). Petitioner has not shown that he is entitled to a business bad debt deduction for 1966 or 1967. First, we are not convinced that the check-exchange loans to USC approximating $50,000 during 1959 and 1960 were made in order to maintain or increase petitioner's law practice. We are aware that the record contains oral testimony tending to show that this was the reason for the loans. This testimony was coupled with two lists of fees from clients which petitioners' brief describes as "direct Strauss corporate fees" and "related fees from Strauss corporate employees, Strauss business acquaintances and Strauss friends," totaling $50,153.74 over the period 1953 through 1967 (excepting 1956 and 1957). This amount is said to approximate 25 percent of petitioner's total legal fees during this period. But we must weigh this testimony against the objective facts. We begin with the fact that petitioner advanced at least $50,000 to USC during a period of less than 2 years, beginning sometime in 1959 and ending on December 31, 1960, whereas the Strauss-related *120 fees and referrals amounted to only about $50,000 over a 13-year period. Because petitioner and Strauss had been close personal friends since 1944, it is likely that many of the friends and associates on petitioner's list of related fees were also petitioner's 12 friends and associates who might have become petitioner's clients regardless of the Strauss friendship. Moreover, Strauss was hardly a pillar in the Atlanta business community at the time the advances were made. He had gone through bankruptcy in Florida in 1958 and had returned to Atlanta in 1959. Petitioner and his law firm were aware of this bankruptcy proceeding since they had filed proofs of claim but recovered nothing on debts in excess of $31,000 arising from advances to Strauss and his corporations between 1948 and 1955 or 1956. Strauss testified that, because he had "tarnished" himself "to a great degree," he took no office in USC and had none of its stock issued in his name. After Strauss returned to Atlanta, he was indicted (in 1963) and convicted (in 1965) of violations of the Georgia Securities Act. See Strauss v. State, 113 Ga. App. 90, 147 S.E.2d 367 (1966). Significantly, also, the *121 check-exchange loans were made to USC, but none of the Strauss-related fees shown on the schedules mentioned above came from that corporation. Compare and contrast Charles W. Steadman, 50 T.C. 369 (1968), affd. 424 F.2d 1 (C.A. 6, 1970), certiorari denied 400 U.S. 869 (1970). The evidence simply does not bear out petitioner's position that Strauss was a significant factor in his income-earning capacity as a lawyer. 13 We think it hardly credible, in view of all these facts, that petitioner, an astute, experienced (in practice in Atlanta since 1935), and able lawyer, would advance over $50,000 to a Strauss-controlled venture so that he could keep Strauss and his corporations as his clients. Strauss admitted that USC borrowed money from petitioner because USC "[couldn't] get enough bank loans." The risk was obvious. It taxes credibility to think petitioner would so "throw good money after bad" for business reasons. We think it much more reasonable to infer that petitioner advanced these moneys to USC as a personal accommodation to Strauss, a personal friend for many years, to aid in his rehabilitation in business or for some other *122 reason undisclosed by the record. Petitioner has not shown the requisite proximate relationship between his law practice and the USC loans. Putnam v. Commissioner, 352 U.S. 82 (1956). His evidence falls far short of showing that maintaining and increasing his law practice was his "dominant motivation" in making the 1959-1960 advances to USC. United States v. Generes, 405 U.S. at 103. The debt representing the loans was neither "created or acquired * * * in connection with a trade or business of the taxpayer" nor "incurred in the taxpayer's trade or business" within the meaning of section 166(d). 14 Any losses which he suffered from such loans, therefore, were nonbusiness bad debt losses under section 166(d), and they were not converted to business losses by the subsequent dealings in USC debentures, regardless of whether the debentures were accepted by petitioner as payment of the loans. Second, we think the evidence requires our finding that the 56 (or 60) USC debentures issued to petitioner and his law firm were received in cancellation of the loans to USC. Here, again, there is oral testimony to the contrary - i.e., that the debentures were *123 issued to petitioner's law firm with the understanding that they would be sold and the proceeds applied on the debt. But the objective facts outweigh that testimony. The debentures were issued in registered form in the name of petitioner's law firm and, according to the vice president and treasurer of USC, they were "valued at face value being the equivalent of the exchange account at that time, approximately." [2] Petitioner sold three lots of 12 debentures each, representing that he owned them or that he or his firm had received them as repayment for certain 15 loans to USC. [3]
Finally, when USC went into bankruptcy, petitioner and his law partner filed claims for the 20 USC debentures which had *124 not been sold. Significantly, there is no suggestion whatever that petitioner or his law firm filed a claim, contingent or otherwise, in the bankruptcy proceeding for any unpaid balance of the loans, as such, to USC. These facts convince us that the debentures were received in cancellation or payment of the loans. Since petitioner and his law firm accepted the debentures as repayment of the loans to USC, petitioner's ownership of the debentures must be viewed as if acquired by purchase or exchange, i.e., in exchange for the settlement of the $50,000 debt. Inasmuch as petitioner was not in the trade or business of buying and selling debentures, the debentures were capital assets in his hands, and any gains or losses sustained in their disposition were capital gains or losses. Secs. 165(g) (1) and 1211. 16 As we view the meager evidence on the point, the effect of petitioner's repurchase of the debentures at costs of $8,072 and $3,047 in 1966 and 1967, respectively, was evidently a rescission of the sales of those debentures. [4] We are not advised of many of the pertinent facts relating to the repurchase of the debentures, e.g., whether the Empire Insurance Company paid *125 anything on its guarantee of payment on the debentures and, if not, whether the matter was litigated; whether the purchasers presented the debentures for payment in the USC bankruptcy proceeding and, if so, how much was collected on them; or how petitioner's payments to the purchasers were computed. However, the stipulation refers to the "repurchase" of the debentures, and when so reacquired they became capital assets in petitioner's hands, worthless though they may have been at that time. [5]
*126 17 As noted above, section 166(e) renders the bad debt provisions inapplicable to a debt which is evidenced by a "security" as defined by section 165(g) (2) (C). This latter section explicitly defines a "security" to include a debenture in registered form. And section 165(g) (1) provides that losses from debentures which become worthless during the taxable year are to be treated as capital losses. Since the USC debentures were in registered form, these provisions are applicable. If petitioner's repurchase of the debentures produced a loss, section 165(g) (1) mandates it be treated as a capital loss. Petitioner argues his case in terms of the repurchase agreements being considered as guarantees that the USC debentures would be paid rather than as rescissions of the sales. In these agreements, however, petitioner obligated himself to repurchase the securities at the original sales price, plus interest, within 90 days or, in one case, 6 months of receiving written notice from the specified client-vendee. The written notice was the only prerequisite to petitioner's repurchase obligation.Consequently, nonperformance by USC under the terms of the debentures was not a condition *127 precedent to petitioner's repurchase obligation. Nor did anything akin to subrogation occur in the relationships of USC, the client-vendee holders of the 18 debentures, and petitioner as repurchaser. Cf. M. Seth Horne, 59 T.C. 319, 334 (1972). In any event, treating the transaction as a guaranty arrangement would not aid petitioner's cause. Since the check-exchange debt was nonbusiness in character and since the "guaranty" was given in connection with the sale of a capital asset, petitioner's dischrage of any guaranty liability would have produced a capital loss. Cf. Putnam v. Commissioner, 352 U.S. at 88-89; Albert J. Harvey, Jr., 35 T.C. 108 (1960). Petitioner's reliance on Stuart Bart, 21 T.C. 880 (1954), is misplaced. There, this Court found (p. 881) that the taxpayer made loans to a client, Physicians Publication, Inc., of which he was advertising agent, in order "to retain the client on a profitable basis, to hold other clients' advertising in the publication of this one, and to maintain his credit standing and reputation as an advertising agent." On the basis of these facts, this Court held (p. 881) that the "debt *128 was proximately related" to the taxpayer's business. For the reasons stated above, the record in the instant case, when considered as a whole, will not support such findings. To reflect the foregoing conclusions, Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. ↩
2. The USC vice president-treasurer could not recall whether the law firm loan account was credited with the debentures issued to petitioner and his law firm. ↩
3. In one letter petitioner described the debentures as "debentures that I own of this company [USC] in which I am a substantial stockholder." In three other letters he referred to them as debentures presently held by this office which were delivered to us in payment for certain loans made to this Company [USC]." ↩
4. Each of the three sales by petitioner of the USC debentures to client-vendees is described in separate pars. 8, 9, and 10 of the stipulation, and each such paragraph contains the statement that the terms of each transaction included an agreement by petitioner to repurchase the debentures for a stated amount. The final paragraph of the stipulation is as follows: "During 1966 and 1967, petitioner paid the sums of $8,072.00 and $3,047.00, respectively, for the repurchase of United Southern Companies, Inc., debentures transferred as described in paragraphs 8, 9, and 10 hereof." ↩
5. Respondent apparently does not challenge the fact that the debentures were worthless when reacquired by petitioner in 1966 and 1967, since the notice of deficiency allows capital losses for the amounts paid on the repurchases in those years. ↩