MERLE W. NICEWANDER AND SARAH NICEWANDER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Nicewander v. Commissioner
Docket Nos. 5634-72, 5635-72, 5652-72.
United States Tax Court
T.C. Memo 1975-234; 1975 Tax Ct. Memo LEXIS 140; 34 T.C.M. (CCH) 1011; T.C.M. (RIA) 750234; July 15, 1975 Filed Charles S. Hirsch, for the petitioners. William L. Ringuette, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Petitioners
Docket No.
Year
Amount
Merle W. and Sarah
5634-72
1968
$ 76,256.64
Nicewander
1969
28,813.39
Florian V. and Kathryn
5635-72
1968
104,405.27
O'Day
1969
43,209.13
Samuel Hess
5652-72
1968
5,755.07
The cases were consolidated for trial. The issues are: (1) Whether land contributed and sold by Munster Development Trust to an exempt organization, within the meaning of section 501(c)(3), [2] had a fair market value of $15,000 per acre at the time of the transactions in question; (2) Whether an indemnity payment *143 made by petitioner Nicewander was made in his capacity as shareholder of Scandia Construction Co., and whether a legal fee incurred in connection with his liability under the indemnity agreement is deductible; (3) Whether the sale of two parcels of property by Fifth Street Estates constituted the sale of property held primarily for sale to customers in the ordinary course of business; and (4) Whether petitioner O'Day adequately substantiated certain travel, meal, and other deductions claimed with respect to a real estate business. FINDINGS OF FACT General
All petitioners were legal residents of Highland, Indiana, when their petitions were filed. Their Federal income tax returns for 1968 and 1969 were filed with the District Director of Internal Revenue, Indianapolis, Indiana. Issue 1. Fair Market Value of Land Contributed and Sold by Munster Development Trust
During 1969, Florian V. O'Day (hereinafter O'Day) and Merle W. Nicewander (hereinafter Nicewander) were each one-eighth partners in Land Trust 2718 of Mercantile National Bank, Hammond, Indiana, commonly *144 referred to as Munster Development Trust. Munster Development Trust was engaged in the real estate business in Munster, Indiana. One other partner in Munster Development Trust was Donald S. Powers (hereinafter Powers), who held a one-quarter interest therein. On April 3, 1963, Munster Development Trust contracted with Purdue Research Foundation (hereinafter Purdue Research) to purchase real estate owned by Purdue Research in Munster. The real estate included a 15 acre tract, the value of which is in question. The eventual recipient of the 15 acre tract from Munster Development Trust was Munster Medical Research Foundation, Inc. (hereinafter Medical Foundation), an exempt organization under section 501(c)(3). The Medical Foundation's eventual acquisition of that tract, in 1969, culminated its search, described below, for a hospital site in Munster. On May 17, 1967, Powers informed the Medical Foundation's Board of Directors that the 15 acre site was "priced at $15,000 an acre." The Executive Committee of the Board of Directors (hereinafter Executive Committee) considered purchase of the 15 acre tract on February 7, 1968; minutes of that meeting state, in part, as follows: [It] *145 was unanimously agreed that the Executive Committee should recommend its approval to the Board of Directors to purchase an option for 15 acres of the Powers property * * *. This land, which is fully improved, would cost $15,000 an acre for a grand total of $225,000. On February 14, 1968, the Board of Directors followed the Executive Committee's recommendation and resolved that "an option be taken to purchase 15 acres of the Powers property." On May 15, 1968, the Medical Foundation entered into a one-year option agreement with Munster Development Trust to purchase the 15 acre tract at a "purchase price" of $225,000, or $15,000 per acre. Minutes of the Board of Directors meeting of February 19, 1969, state that "the 15 acre option at $15,000.00 an acre * * * was due to expire in May of 1969. Under the agreement 7 acres were to be purchased in May of 1969 and an additional 8 acres were under option." Minutes of the Executive Committee's meeting of March 12, 1969, record that "Mr. Singleton * * * stated that our option was up at the end of May of this year and that he felt that the Munster Development Trust would be willing to sell 10 acres to the Foundation now at the price of $150,000. *146 On April 1, 1969, the Medical Foundation accordingly notified Munster Development Trust that it would not exercise its option because the Medical Foundation was "not in a position to purchase the 15 acres of land, due to the fact that sufficient funds have not been raised to justify an expenditure for land acquisition of the sum of $225,000." On April 9, 1969, the Medical Foundation offered to purchase 10 acres of the 15 acre tract for $150,000 or $15,000 per acre. Munster Development Trust accepted that offer on April 16, 1969. Also on April 16, 1969, Munster Development Trust paid Purdue Research $30,000, or $3,000 per acre, for the 10 acre tract, and agreed to also pay 20 percent of any amount by which the resale price received by Munster Development Trust exceeded $15,000 per acre. The record is unclear as to how the above terms were determined. The Medical Foundation paid $100,000 on the purchase on May 1, 1969. Minutes of the Medical Foundation's Board of Directors meeting of May 21, 1969, state, in part, as follows: Mr. Robinson then indicated that a $100,000.00 down payment had been made on the land and asked Board member, Palmer Singleton to report on the land purchase. *147 Mr. Singleton reported that the initial payment had been made and the Deed to the real estate purchased is in escrow and the additional $50,000.00 for the land was to be paid on or before July 1st, 1969. Mr. Singleton also reported there was a possibility that a Pipeline Company intended to lay their pipeline on the west side of Columbia Avenue at an area 25 feet immediately west and adjacent to Columbia Avenue. * * * Finally a Resolution was * * * unanimously passed. The Resolution is as follows: "RESOLVED: That Palmer Singleton be and he is hereby authorized to negotiate a pipeline easement on that part of the Foundation's property immediately adjacent to Columbia Avenue in co-operation with the Munster Development Trust." The Medical Foundation paid $50,000 to Munster Development Trust on or about July 11, 1969. On or about July 15, 1969, Munster Development Trust conveyed the 10 acre tract to the Medical Foundation by quitclaim deed for $150,000. On or about September 5, 1969, Purdue Research conveyed 23.258 acres in Munster, which included the 15 acre tract, to Munster Development Trust for $69,774.00, or $3,000 per acre, plus 20 percent of any resale price received by Munster *148 Development Trust in excess of $15,000 per acre. On October 10, 1969, Judge James J. Richards of Lake County Superior Court appointed three disinterested appraisers to assess damages which Purdue Research, Munster Development Trust, and the Medical Foundation would sustain from condemnation of a 40 foot easement across the 10 acre tract and other nearby property by Wolverine Pipe Line Company. The right of way and easement across the 10 acre tract covered approximately 31,200 square feet, or approximately three-fourths of 1 acre. The appraisers were charged with assessment of damages arising from construction, operation and maintenance of a petroleum pipeline system in, upon or through the easement and right of way involved. Since the pipes were to be installed three feet underground, the right to use the land for certain purposes, including, but not limited to, driveways, parking areas and utility facilities, was reserved to the Medical Foundation. The official Report of Appraisers found that the value of the land to be appropriated was $5,300, and the value of other damages which would result from construction of the pipeline was $800. These damages were awarded solely to the *149 Medical Foundation with regard to the 10 acre tract; separate damages were awarded to Purdue Research and Munster Development Trust with regard to other nearby properties. Minutes of the Medical Foundation's Board of Directors meeting of November 12, 1969, read, in part, as follows: Attorney Steve Crist, representing Palmer Singleton, Jr. * * * reported that the Court appointed appraisers reached an evaluation for the easement of $6,100.00 or approximately $15,000.00 an acre * * *. The following resolution was then * * * unanimously adopted: "RESOLVED: That the Foundation authorize Palmer Singleton, Jr., to settle the condemnation case with the Wolverine Pipe Line Company for the sum of $6,100.00." On November 14, 1969, Munster Development Trust donated a 5 acre tract to the Medical Foundation. The 5 acre tract abutted the 10 acre tract previously sold to the Medical Foundation and constituted the remainder of the 15 acre tract for which the Medical Foundation earlier had an option to purchase. On April 7, 1970, Vernon E. Lee (hereinafter Lee), an appraiser retained by Powers, submitted an appraisal to Powers of the 5 acre tract as of that date. In this appraisal, Lee analyzed *150 recent sales in the area and estimated fair market value by comparing the properties sold to the 5 acre tract. After determining that front footage on Calumet Avenue and on a proposed road adjacent to the 5 acre tract was worth $166,725, the appraisal determined that a remaining 1.09 acre parcel of the 5 acre tract with no front footage on any existing or proposed road had a value of $5,000. The total value of the 5 acre tract was therefore determined to be $171,725, or, rounded, $172,000. In valuing the 1.09 acres, the Lee appraisal noted that: Pepsi cola [sic] Company, in 1967 purchased 19.6 acres on Calumet Avenue to the south of the parcel being appraised for a reported $232,000.00. It is reported that the installation of streets and sewers cost an additional $100,000.00. This indicates a value of $332,000.00 as of that date or about $16,970.00 per acre. It is our opinion that the 1.09 acres has a value of about 30% of the parcels described due to its location and limited use. We have estimated its value to be $5000.00. On October 5, 1972, Lee submitted to Powers an appraisal of the 10 acre tract's fair market value on April 16, 1969. A sales comparison approach was again *151 utilized, but no front footage computations were made. The appraisal states, in part, as follows: The following transactions were used in this approach. 1. In August, 1966, 19.6 acres, located on Calumet Avenue near 45th Street sold for $25,000.00 per acre which included the installation of all public utilities to this site. This property was sold as a Plant site for the Pepsi-Cola General Bottlers and is now improved with an attractive modern Plant. * * *
In estimating the value of the subject property in April of 1969, I have relied heavily upon the only reliable sale, Comparable No. 1 that had occurred in the immediate area and estimated its fair market value at $25,000.00 per acre. The appraisal concluded that the 10 acre tract's fair market value on April 16, 1969, was $250,000. An appendix to the appraisal contains a "Community Analysis" of Munster by Northern IndianaPublic Service Company, revised as of September, 1971. Page 4 of that Analysis states that the price range of various industrial sites in Munster was $2,500 to $13,000 per acre. On November 5, 1973, Leo G. Pryma (hereinafter Pryma), an Internal Revenue Service Engineer, prepared an Engineering and *152 Valuation Report which also used the sales comparison approach in appraising the 5 and 10 acre tracts. Pryma examined five sales, including: E. Corporate Warranty Deed * * * indicates a selling price of $110,000 for 13.45 acres or about $8,200 per acre. This property was sold to Pepsi-Cola General Bottlers, Inc., and is located west of Calumet Avenue. (See Exhibit G). F. Warranty Deed * * * indicates a selling price of $64,500 for 6.41 acres or about $10,060 per acre. This property was also sold to Pepsi-Cola General Bottlers, Inc., and is located adjacent to but south of Parcel E. (See Exhibit H). Pryma appraised the 5 and 10 acre tracts at $15,000 per acre. In Lee's opinion, the 19.86 acres purchased by the Pepsi-Cola Company (hereinafter Pepsi-Cola property) had many similar features to the 10 acre tract. Although the two deeds used to convey the Pepsi-Cola property, as noted in Pryma's appraisal, indicate a price of $174,500, the actual purchase price of that property was $225,000; the record contains no evidence to explain the discrepancy. The record does contain evidence, however, showing that the following costs were incurred by Pepsi-Cola in connection with purchasing *153 this property and improving it for commercial use: 100,000 yards of land fill at $1 per yard, $100,000; sewer costs, $50,000; street development costs, $6,327.60; and sales commission, $7,000. Apart from Lee's appraisals, which give no details to support their conclusions, the total proven cost of the 19.86 acres, in a condition suitable for commercial use, was thus $388,327.60, or approximately $19,500 per acre. With regard to the 10 acre tract, Powers testified that certain improvements, including a water main and storm sewer, were all adjacent to that tract. Connection of the water main to the hospital site and installation of other improvements on that site cost $80,349.94. Munster Development Trust claimed a charitable contribution on its 1969 partnership income tax return, dated March 19, 1970, of $170,000 for donation of the 5 acre tract to the Medical Foundation. On an amended partnership income tax return for 1969, filed in November, 1972, $172,006 was claimed as a charitable contribution for that donation, and $100,360 was claimed as a charitable contribution resulting from an alleged bargain sale of the 10 acre tract. Nicewander and O'Day each claimed $21,251 on their *154 respective 1969 Federal income tax returns as their share of the 5 acre tract donation, but did not claim any share for the alleged bargain sale of the 10 acre tract. As of the date of trial, no additional payments had been made by Munster Development Trust to Purdue Research as a result of the five acre donation and 10 acre sale. Issue 2. Indemnity Payment by Nicewander
Nicewander, together with Arne Jarnholm, formed Scandia Construction Co. (hereinafter Scandia), an Illinois corporation, on July 13, 1965. Its capitalization was $20,000, of which Nicewander contributed $13,500. Nicewander also lent Jarnholm $6,500 to finance the latter's one-third interest; Jarnholm was a "working stockholder" in Scandia. Nicewander received 27 shares of stock and Jarnholm received the remaining 13 shares of stock issued by the corporation. On July 8, 1966, Nicewander, his wife Sarah, Jarnholm, and Jarnholm's wife entered a General Indemnity Agreement (hereinafter Agreement) with Capital Indemnity Corporation (hereinafter Capital) and Scandia to assist Scandia in its bids on construction contracts. Scandia had insufficient assets to guarantee indemnity to a bonding company for performance *155 of its work. The only income (salary or distribution) that Nicewander received from Scandia was $2,400 in salary for several weeks' work in 1967. Nicewander did not sign the Agreement to protect his employment at Scandia or to protect his own trade or business as an engineer. Nicewander's basic interest in Scandia was that of an investor. He signed indemnity agreements on behalf of Scandia as a stockholder or private individual. Scandia became insolvent and ceased business activity in December, 1967. Scandia defaulted on its performance and payment bonds in that month, and, as a result, on January 20, 1968, a demand was made on Nicewander and Jarnholm by Capital under the Agreement. Nicewander accordingly paid Capital $33,000 as indemnitor of Scandia in February 1968. Nicewander also paid Attorney John T. Garrity $1,500 for legal services relating to his indemnitor's liability under the Agreement. On March 5, 1968, Capital released Nicewander from any liabilities arising under the Agreement. Subsequent to March 13, 1968, Nicewander transferred his Scandia stock to James and Marilyn Davis. Other businesses Nicewander was engaged in at the time of the transactions in question *156 also required payment and performance bonds, and a default on the Scandia bonds would have affected those other businesses. He would have complied with the Agreement regardless of such other businesses because of his personal liability thereunder, however. Nicewander believed his personal liability and business reputation were equal reasons for him to make payment. He has signed 12 to 13 indemnity bonds on behalf of partnerships since 1968. Issue 3. Sales of Land by Fifth Street Estates
Fifth Street Estates was a partnership engaged in the real estate business in Highland, Indiana, during 1968, 1969, and all times material herein. O'Day, Hess, and one Carl Pettit each owned a one-third interest in Fifth Street Estates, as well as a one-third interest in Hess Land Development Company and Hopp Land Developers. Fifth Street Estates bought and subdivided land, and Hess Land Development Company and Hopp Land Developers would purchase the land from Fifth Street Estates and then develop it; Fifth Street Estates did not develop land itself. The land Fifth Street Estates purchased was conveyed to Hess Land Development Company and Hopp Land Developers at a price slightly above cost to *157 avoid legal complications during development should one of the Fifth Street Estates partners die. On June 19, 1961, O'Day and Nicewander contracted with Victor A. and Eva Kirsch to purchase 108 acres of land later known as Lakeside Addition to Highland, Indiana (hereinafter Lakeside Addition). On January 10, 1962, Nicewander and Chester Ziemniak, an engineer, presented a preliminary development plat of the Lakeside Addition to the Plan Commission of Highland (hereinafter Plan Commission) on behalf of Nicewander and O'Day. [3] Minutes of the Plan Commission meeting of December 12, 1962, state, in part, as follows: Mr. Chester Ziemniak appeared before the commission and informed the members that he had been employed by Mr. O'Day as an engineer for the proposed Lakeside Addition. * * * Mr. Ziemniak was informed that the original plat had not been acceptable primarily because of no satisfactory school site, insufficient acceptable recreation areas, and inadequate and unsatisfactory disposal of storm water. [Emphasis added.] *158 The 1961 contract with the Kirschs for purchase of the Lakeside Addition had been nullified by the purchasers' failure to comply with its terms, through no fault of their own. Consequently on March 19, 1963, the Kirschs again contracted to sell the Lakeside Addition to O'Day, Hess and Pettit, for $248,586. Subsequently, by warranty deeds dated March 31, 1964, July 16, 1965 and June 7, 1966, the Kirschs did convey the Lakeside Addition to O'Day, Hess, and Pettit, as trustees. On April 10, 1963, after contracting to purchase the Lakeside Addition but before actual purchase, Ziemniak presented a new preliminary plat for the Lakeside Addition that had property set aside for a school site. On April 24, 1963, the Plan Commission approved that plat. On July 16, 1963, O'Day, Hess, and Pettit gave the School Town of Highland (hereinafter School Town) an option to purchase 10 acres in the Lakeside Addition tract in return for, among other considerations, a sewer easement across certain school property. Construction of a storm sewer was necessary for development of the Lakeside Addition, and the right to build it across school property saved Fifth Street Estates over $70,000, in contrast *159 to a longer alternative route. Before 1966, Fifth Street Estates did not sell any part of the Lakeside Addition to other than its own partners. During 1966, 1967, and 1968, Fifth Street Estates sold 216, 65, and 143 lots, respectively, to Hess Land Development Company or Hopp Land Developers. Prior to these sales, Fifth Street Estates spent considerable time getting plats approved for subdivision of such lots. On August 26, 1968, O'Day, Hess and Pettit conveyed 12.39 acres in the Lakeside Addition to the School Town for $61,950. [4] The partners' intent was always to build apartments on the property eventually sold to the School Town, if the School Town failed to exercise its option. The original preliminary plat filed with the Plan Commission indicated single family residential units were to be built on that property; the partners' intent was to later file for a rezoning of that property, having already protected themselves by having the land zoned for single family residential units should that rezoning not be approved. *160 On September 23, 1968, real estate broker W. C. Pentek wrote to O'Day at Hess Land Development Co. regarding "2 parcels of business and apartment sites that front on 45th Street in your Lakeside Addition of Highland." The two parcels referred to (hereinafter Commercial Addition) were set aside as "not included" on plats submitted to the Plan Commission in the early 1960's. The partners of Fifth Street Estates had always intended to develop the Commercial Addition themselves. On July 15, 1964, the Plan Commission approved O'Day's petition to rezone the Commercial Addition to business zoning. Sometime following this approval, Fifth Street Estates commissioned Livingston & Associates, Architects, to prepare a site plan showing commercial development of the Commercial Addition; such plan was submitted on February 23, 1966. Fifth Street Estates also had Livingston & Associates prepare a building elevation plan for the Commercial Addition. The partners discussed developing the Commercial Addition and informally discussed financing with various lending institutions. O'Day contacted several real estate brokers to try to obtain tenants for the proposed development, but response was negative *161 due to insufficient population density in that area to support a commercial development at that time. For this reason, plus illness among the partners and the difficulty of obtaining financing, plans to develop the Commercial Addition were suspended. Upon receiving Pentek's inquiry concerning the Commercial Addition, the partners replied that the property was not for sale. Pentek insisted that they set a price, however, and they accordingly did. When Pentek said he would meet that price, the partners decided that, because of the lack of financing and the fact that they could gain as much by sale of the property as by developing it for ten years, they would sell the property. An option was granted to R. B. Associates, the prospective buyers, and on December 11, 1968, the property was sold to them. R. B. Associates did later develop the Commercial Addition. Fifth Street Estates never constructed any apartments, businesses, or other structures; it was just in the business of developing land. The Commercial Addition and other properties held by Fifth Street Estates were never offered nor advertised for sale. Issue 4. Substantiation of Travel, Meal, and Other Expenses by O'Day
*162 O'Day's joint Federal income tax returns for 1968 and 1969 list his occupation as "real estate;" his wife's occupation is listed as "housewife." Besides his real estate interests in Indiana during those years, some of which have been described above, O'Day claimed expenses for certain activities he engaged in in Florida during those years, in the following amounts: Type of Expense
1968
1969
Auto expenses
$ 216.00
$150.00
Air travel expenses
1,494.00
985.00
Expenses away from
700.00
500.00
home office
Lunch and dinner
126.00
310.00
expenses
All expenses claimed, except for air travel expenses, were estimates of O'Day's. No substantiation or specific testimony was provided with regard to meals and expenses away from his home office, and the few gasoline charge slips presented were not specifically related to particular business transactions or occasions. As to air travel expenses, petitioner provided as substantiation written notations on the corners of tickets and an incomplete diary and appointment calendar. Although such evidence indicated that O'Day was trying to start development of a mobile home park in Florida during this period, the *163 amount of time spent on such matters on each trip was not specifically established. O'Day and his wife resided in Florida from the end of December through February or March each year. O'Day received no income from the business ventures in Florida for which the deductions claimed were related, although the mobile home park was sold in 1971 for over $300,000. Some of the deductions were for expenses claimed to have been incurred by his wife, Kathryn O'Day, who sometimes acted as O'Day's secretary and bookkeeper. However, no evidence was introduced to establish the time spent on such services, the type of services rendered, or other specific information thereabout. O'Day did not deduct his wife's air fare if she merely went along to Florida with him as a companion, rather than as a secretary and bookkeeper. The trip lists which O'Day produced at trial were not made contemporaneously with the trips. O'Day's failure to produce specific records to substantiate the claimed deductions was not due to circumstances beyond his control, such as destruction by fire, flood, earthquake, or other casualty. The evidence introduced shows that O'Day's activities in 1968 and 1969 were related *164 to development of a mobile home park. OPINION Issue 1. Fair Market Value of Land Contributed and Sold by Munster Development Trust
The first issue is whether O'Day and Nicewander are entitled to a charitable contribution deduction under section 170(a)(1). [5] They contend that sale of the 10 acre tract constituted a bargain sale, as the fair market value of the tract at the time of sale was $250,000, rather than the $150,000 actually paid by the Medical Foundation. [6] O'Day and Nicewander further claim that the 5 acre tract donated to the Medical Foundation had a fair market value at the time of donation of $172,000, rather than the $75,000 claimed by respondent. Respondent contends that both the 10 and 5 acre tracts had a fair market value at the time of the transactions in question of $15,000 per acre. *165 We agree with respondent. What the fair market value of a piece of property is at a given date is, of course, a question of fact, Philip Kaplan,43 T.C. 663, 665 (1965), and the facts herein overwhelmingly support respondent's position. First, the appraisal report of petitioners' own expert contains, in its appendix, a "Community Analysis" of Munster prepared by Northern IndianaPublic Service Company. Page 4 of that Analysis, which was revised in September 1971, indicates that the price range of industrial sites in Munster ranged from $2,500 to $13,000 per acre. Since the evidence indicates this was a period of rising land prices in Munster, the 1971 revision date cannot be faulted as coming too late after the transactions in question. Second, an independent appraisal of the value of an easement across the 10 acre tract was provided less than four months after conveyance of the 10 acre tract and approximately one month before donation of the 5 acre tract. Minutes of the Medical Foundation's Board of Directors meeting of November 12, 1969, state that "Court appointed *166 appraisers reached an evaluation for the easement of $6,100.00 or approximately $15,000.00 an acre." The close proximity in time of this independent appraisal to the transactions in question is entitled to substantial weight. Third, specific evidence introduced as to the value of the Pepsi-Cola tract indicates a maximum improved value of only $19,550 per acre. The contradictory valuations in Lee's two appraisals are general and do not refute this valuation of the Pepsi-Cola property. Since both parties' appraisers indicated the Pepsi-Cola tract was the most comparable of the other property sales examined by both to the properties in question, we believe $25,000 and $34,000 per acre valuations of such properties are not supported by the evidence introduced concerning the Pepsi-Cola tract. Furthermore, since over $80,000 in utility connections and other such improvements were necessary, at the hospital site, comparison of improved Pepsi-Cola property with the unimproved hospital site is unwarranted. Fourth, concerning the 10 acre tract conveyance, no contemporaneous evidence was introduced which would indicate that a gift was involved in that conveyance. Minutes of Board of Directors *167 meetings and legal instruments used to convey the 10 acre tract give no indication a gift was involved. Indeed, the 1969 Federal income tax returns of O'Day, Nicewander, and Munster Development Trust do not even claim deductions for the alleged bargain sale of the 10 acre tract. Furthermore, no evidence was introduced, besides Munster Development Trust's amended 1969 Federal income tax return, to support a claim that a bargain sale was made. Petitioners accordingly failed to carry their burden of proof on this point. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Fifth, as to the 5 acre tract, no specific explanation was given to support an increase in price from $15,000 an acre, the price specified in the option given to the Medical Foundation, to $34,000, the value per acre claimed, in a period of approximately 18 months. The same is true, to a lesser degree because of a lesser price claimed and less time elapsed, of the 10 acre tract. On the basis of the entire record, we conclude that the value of the 10 acre tract at the time of sale was $150,000, and the value of the 5 acre tract at the time of donation *168 was $75,000. Issue 2. Indemnity Payment by Nicewander
The second issue is whether Nicewander's indemnity payment is deductible under section 165(c)(2), section 166(a)(1), or section 166(d)(1). Section 165(c)(2) allows an individual to deduct losses incurred in any transaction entered into for profit, though not connected with a trade or business. Section 166(a)(1) allows as a deduction any debt which becomes worthless within the taxable year. Section 166(d)(1) allows only short-term capital loss treatment to nonbusiness debts of individuals which become worthless within the taxable year. Nicewander contends either of the first two sections are applicable, resulting in an ordinary loss; respondent contends only short-term capital loss treatment is allowable under section 166(d)(1). The threshold question for this issue is whether section 165(c)(2) applies, rather than section 166. Nicewander was an indemnitor in a typical four-party indemnity situation, i.e., as indemnitor he promised the surety, Capital, that he would secure Capital against any loss on Capital's obligation to the *169 creditor-obligee, whose identity is unknown in this case, on any default by the principal-contractor, Scandia. An indemnitor in such a four-party situation is to be treated the same as a guarantor. United States v. Hoffman,423 F. 2d 1217 (9th Cir. 1970); M. Seth Horne,59 T.C. 319, 333-337 (1972), on appeal (9th Cir., May 11, 1973). A guarantor, upon payment, stands in a creditor-debtor relationship with his principal and must look to section 166 for deduction of related losses. Furthermore, the debt arising out of a guarantee that has been performed is a "debt" under section 166. M. Seth Horne,supra.Accordingly, section 166 is applicable herein. Since sections 165 and 166 are mutually exclusive, Putnam v. Commissioner,352 U.S. 82 (1956); Spring City Foundry Co. v. Commissioner,292 U.S. 182, 189 (1934) (involving sec. 234(a)(4) and (5) of the Revenue Act of 1918, 40 Stat. 1077, predecessor of secs. 166 and 165), we need not discuss section 165 further. The second question is whether Nicewander's indemnity *170 payment constituted a business or nonbusiness bad debt. Section 166(d)(2)(B) states that "nonbusiness debt" means a debt "other than * * * a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." Section 1.166-5(b)(2), Income Tax Regs., provides, in part, as follows: The question whether a debt is a nonbusiness debt is a question of fact in each particular case. * * * [The] character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided * * *. In determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, the proper *171 measure is that of taxpayer's dominant motivation; significant motivation is insufficient. United States v. Generes,405 U.S. 93, 103 (1972); Niblock v. Commissioner,417 F. 2d 1185, 1187 (7th Cir. 1969). We believe petitioner has failed to establish that his dominant motivation in making the indemnity payment was in connection with his trade or business. His testimony that his only interest in the corporation was that of an investor is especially damaging. Furthermore, his salary of $2,400 for only one year is insignificant in comparison with his capital investment of $13,500, [7] which dispels any notion he was trying to preserve a salary. Finally, his dominant motivation at the time he signed the indemnity agreement was clearly not to protect his credit rating for other businesses, as Scandia was not in financial trouble at that time. As in Robert E. Gillespie,54 T.C. 1025, 1031 (1970), affd. F. 2d (9th Cir., Sept. 18, 1972, 30 AFTR 2d 72-5574, 72-2 USTC par. 9742), we look to the initial transaction pursuant to which Nicewander entered the agreement in question, and the evidence concerning Nicewander's *172 motivation at that time does not support his position.
The indemnity payment thus constituted a nonbusiness bad debt under section 166(d) and must be treated as a short-term capital loss. As to the $1,500 legal fee incurred in connection with Nicewander's indemnity liability, we believe such fee is deductible under section 165(c)(2) as an expense incurred in connection with a transaction entered into for profit. We believe that Nicewander's testimony that his interest in Scandia was that of an investor was correct; accordingly, this fee is deductible in this situation. Robert E. Imel,61 T.C. 318, 327 (1973); Mozelle Rushing,58 T.C. 996, 1000-1005 (1972); Peter Stamos,22 T.C. 885, 890-891 (1954); Marjorie Fleming Lloyd-Smith,40 B.T.A. 214, 223 (1939), affd. 116 F. 2d 642 (2d Cir. 1941), cert. denied 313 U.S. 588 (1941). Issue 3. Land Sales by Fifth Street Estates
The third issue is whether gain realized *173 from the sale of certain properties by Fifth Street Estates constituted ordinary income or capital gain. O'Day and Hess contend that neither the property sold to the School Town nor the Commercial Addition was held for sale to customers in the ordinary course of business, resulting in capital gains. Respondent contends both properties were so held; as such, any gain realized would be ordinary income. Section 1221(1) states, in part, that "capital asset" does not include property held by a taxpayer primarily for sale to customers in the ordinary course of his trade or business. As used in section 1221(1), "primarily" means "of first importance" or "principally." Malat v. Riddell,383 U.S. 569, 572 (1966). Although many factors have been considered by the courts in determining whether a particular piece of property is a capital asset or inventory, no single element is conclusive and each case must rest upon its own facts. Scheuber v. Commissioner,371 F. 2d 996, 998 (7th Cir. 1967). Of course, capital gains provisions, since they are exceptions to normal *174 tax requirements, are to be narrowly construed. Corn Products Refining Co. v. Commissioner,350 U.S. 46, 52 (1955). We believe the sale to the School Town of 12.39 acres of the Lakeside Addition did constitute the sale of property held by Fifth Street Estates primarily for sale to customers in the ordinary course of its trade or business. Fifth Street Estates knew as early as December 12, 1962, that a satisfactory school site was necessary for development of the Lakeside Addition. This was over three months before O'Day, Hess and Pettit signed the contract under which the Lakeside Addition was eventually purchased. Although O'Day testified that the partners intended to build apartments on the property sold to the School Town if the latter's option was never exercised, there is no evidence in the record to indicate that the option would not be exercised, or that the partners ever expected it would not be exercised. We therefore believe the partners' intentions concerning the School Town property in the event the option was not exercised can at best be described as only faint hopes. Finally, there is no question that Fifth Street Estates was in the trade or business *175 of selling property, as numerous lot sales in the Lakeside Addition indicate. The burden of proof is on petitioners to establish that the property sold was not held by them primarily for sale to customers in the ordinary course of a trade or business. S. O. Bynum,46 T.C. 295, 298 (1966). In view of the above facts, and in view of a total lack of evidence to support petitioners' position, except for their own testimony at trial, we hold that petitioners have not sustained their burden of proof on this issue. We find differently as to the Commercial Addition, however. It is possible for a real estate dealer to hold specific property for investment purposes rather than for sale in the ordinary course of business; furthermore, a taxpayer's purpose for holding property may vary with respect to different tracts, and each transaction should be examined and considered independently. Municipal Bond Corp. v. Commissioner,382 F. 2d 184, 186 (8th Cir. 1967). In making this determination, several factors are significant. First, the Commercial Addition was consistently *176 excluded from development plats submitted to the Plan Commission as the Lakeside Addition was being developed. Second, Fifth Street Estates commissioned a site plan and building elevation plan for its development of the Commercial Addition. Third, Fifth Street Estates never advertised the Commercial Addition for sale, nor solicited offers for its purchase. Richard H. Pritchett,63 T.C. 149 (1974); Maddux Construction Co.,54 T.C. 1278, 1287 (1970). Although this practice was consistent with Fifth Street Estates' prior practice with respect to the Lakeside Addition, a significant distinction is that Lakeside Addition parcels were sold to Fifth Street Estates' partners individually or Hess Land Development Company or Hopp Land Developers, whereas the Commercial Addition was sold to an outside party. Fourth, as in Maddux,supra, Fifth Street Estates had no customers for commercial property in the ordinary course of its business. The sale of the Commercial Addition was the only transaction in which Fifth Street Estates purchased a large tract of undeveloped real estate, held it for a period of time, and then sold it in bulk for *177 commercial use. Although the taxpayer in Maddux was not in the general real estate business, in both Maddux and this case the sales in question were clearly separate from ordinary transactions in the course of the trade or business in each case. Capital gains treatment is accordingly appropriate herein, as "the fundamental objective of the capital gain provisions of the Code * * * is to grant preferential treatment to the gains realized upon those transactions which are not normally the source of business income." Raymond Bauschard,31 T.C. 910, 916 (1959), affd. 279 F. 2d 115 (6th Cir. 1960). Finally, as in Pritchett,supra, and Maddux, Fifth Street Estates abandoned an original intention to develop the property. Although it can be difficult to ascertain intent, the testimony and evidence introduced is consistent with this interpretation of the facts. We accordingly hold that O'Day and Hess have sustained their burden of proving the Commercial Addition was not held primarily for sale to customers in the ordinary course of their trade or business. Issue 4. Substantiation of Travel, Meal, and Other Expenses by *178 O'Day
Section 274(d) provides, in part, that no deduction shall be allowed under section 162 for any traveling expense, including meals and lodging while away from home, unless taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement the amount of such expense, the time and place of the travel, and the business purpose of the expense. Section 274(d) contemplates that no deduction shall be allowed on the basis of approximations or unsupported testimony of the taxpayer, and that a taxpayer will produce such substantiation as will constitute clear proof of a claimed expenditure. Section 1.274-5(a) and (c)(1), Income Tax Regs.
O'Day produced no adequate records or sufficient evidence to corroborate his own testimony at trial, as required by section 274(d), with regard to "expenses away from home office" and lunch and dinner expenses. The amounts claimed were admittedly estimates, and the record lacks any evidence at all concerning the amounts, business purposes, or times and places of the expenditures. O'Day also admitted at trial that the *179 auto expenses were estimates. Although some gas station receipts were presented to support these claims, the receipts were not connected with specific business occasions, and the times and places of travel were not specified. As to the airline tickets, although O'Day has shown the amount and date of each expense, once again the amount of time claimed for business matters on each trip is an estimate of his, and no specifications are provided as to his wife's activities. Although O'Day did spend some time in Florida trying to establish his mobile home park during the years in question, he has not met his burden of proof under section 274(d). Since the approximation doctrine of Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930), has been displaced by section 274 (see section 1.274-5(a), Income Tax Regs.), this deduction must be disallowed in its entirety. In summary, although O'Day did testify and produce some evidence regarding various expenditures in issue, he did not meet the substantiation requirements of section 274(d) and the regulations thereunder. In view of the foregoing, we need not reach respondent's contention that O'Day, *180 in trying to develop the mobile home park, was not actually engaged in an established trade or business in Florida during 1968 and 1969. Decisions will be entered under Rule 155.
Footnotes
1. Consolidated herewith are the following cases: Florian V. O'Day and Kathryn O'Day, docket No. 5635-72; Samuel Hess, docket No. 5652-72.↩
2. Stautory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
3. Nicewander lost interest in acquiring the Lakeside Addition in June, 1962, shortly after which Hess and Pettit joined O'Day in the venture. Stipulation 53 incorrectly indicates that the preliminary plat was also presented on behalf of Pettit.↩
4. The increase to 12.39 acres from the 10 acres specified in the option was made to qualify the property under Indiana school property requirements.↩
5. Section 170(a)(1) provides that there shall be allowed as a deduction any charitable contribution or gift, payment of which is made in a taxable year. Section 1.170A-1(c), Income Tax Regs., provides that if a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution. The term "bargain sale," as used in the Income Tax Regulations, means a transfer of property which is in part a sale or exchange of the property and in part a charitable contribution of the property. See, e.g., section 1.170A-4(c)(2)(iii)↩. 6. The Medical Foundation, an organization described in section 501(c)(3), is an organization to which a gift would qualify for deduction under section 170(a)(1) and (c)(2)↩.
7. No evidence was introduced as to whether even part of the $6,500 lent by Nicewander to Jarnholm to finance the latter's stock ownership in Scandia was repaid.↩