STUART M. MODELL AND JUDITH S. MODELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Modell v. Commissioner
Docket No. 11323-77.
United States Tax Court
T.C. Memo 1983-761; 1983 Tax Ct. Memo LEXIS 36; 47 T.C.M. (CCH) 706; T.C.M. (RIA) 83761; December 19, 1983. Leonard J. Witman, for the petitioners. Joy M. Miyasaki, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for taxable years ending December 31, 1971, and December 31, 1972, in the respective amounts of $27,056.26 and $25,803.78. After concessions, the issues for decision herein are as follows: (1) Whether payments made by petitioner, Stuart M. Modell, during taxable years 1971 and 1972 to lenders and trade creditors of F&J Derusting Co., Inc., in discharge of his guarantee obligations, resulted in business or nonbusiness bad debt losses pursuant to section 166; [1] and (2) whether payments made by petitioner, Stuart M. Modell, during taxable years 1971 and 1972 to shareholders *38 of the same company, in discharge of his guarantee obligations, qualify under section 162(a) as deductible ordinary and necessary expenses of his established accounting business. FINDINGS OF FACT Some of the facts have been stipulated, and are found accordingly. The stipulation and the exhibits attached thereto are incorporated by this reference. Stuart M. Modell (hereinafter referred to as "petitioner") and Judith S. Modell, husband and wife (hereinafter referred to, collectively, as "petitioners"), were residents of Livingston, New Jersey, at the time of filing their petition herein, and timely filed joint Federal income tax returns for taxable years 1971 and 1972, with the Internal Revenue Service Center in Holtsville, New York. Petitioner graduated from the Rutgers University School of Business in 1962, receiving a Bachelor of Science degree. Immediately following graduation, petitioner worked for a certified public *39 accountant in Newark, New Jersey. In 1966, petitioner became a certified public accountant in the State of New Jersey. Thereafter, petitioner began his own accounting practice, developing a client base which included, between 1968 and 1971, the division of psychiatry at Louisiana State University. Initially, at least, petitioner practiced accounting out of his home in Livingston, New Jersey. At some point during the late 1960's, petitioner was approached by Joseph Cricco (hereinafter referred to as "Cricco") and his wife, Frances Cricco, who were at that time clients of petitioner's accounting practice, concerning a process for removing rust from metal, which had been invented by Cricco's late father. Cricco showed petitioner photographs of the process, and performed for petitioner a demonstration of the process which consisted of immersion of a piece of rusted metal into a chemical solution, resulting in removal of the trust. Believing that the derusting process described by Cricco showed promise as a potential business enterprise, petitioner recommended that Cricco have the derusting substance tested at a testing laboratory located in Hoboken, New Jersey. Cricco complied, *40 and the results of the tests were satisfactory to petitioner. On July 10, 1969, F&J Derusting Co., Inc. (hereinafter referred to as "F&J") was incorporated in the State of New Jersey. F&J was formed to produce and market the derusting substance which Cricco had earlier demonstrated for petitioner. Initially, F&J was located at petitioner's home in Livingston, New Jersey, which was also the office for his accounting practice. Later, F&J opened a factory in Rahway, New Jersey, at which the derusting substance was manufactured. Beginning in July 1969, in addition to his regular accounting practice, petitioner actively participated in the formation, management and operation of F&J. Petitioner was an incorporator of and shareholder in F&J and performed bookkeeping and recordkeeping services for the company. From the date of incorporation of F&J until at least June 1972, petitioner served as F&J's secretary/treasurer and director, and advised and assisted in the administration of the company. From the date of incorporation of F&J until at least August 9, 1971, petitioner was F&J's registered agent, authorized to receive service of process for the company. Petitioner's activities *41 on behalf of F&J occupied approximately 25 percent of his working time, with the remainder of such time occupied by his ongoing accounting practice. In addition to petitioner, three other persons served as incorporators and directors of F&J; namely, Cricco's wife, Frances A. Cricco, James M. Guzzi and Peter J. Harff. Neither Harff nor Frances A. Cricco were actively involved in F&J's operations. Production of the derusting substance was the responsibility of Cricco, who was assisted at the factory by Guzzi. Petitioner believed that F&J would require financing to operate and to expand. Accordingly, in addition to the afore-described activities, petitioner became the principal solicitor of funds for F&J. As such, petitioner secured for the company investors and lenders as well as trade creditors, who advanced goods and services for the company's operations. A number of the shareholders, lenders and trade creditors were also clients of petitioner's ongoing accounting practice. Petitioner guaranteed to certain of F&J's lenders and shareholders that he would personally repay them for their loans and investments in the event that F&J was unable to do so. Petitioner also guaranteed *42 to certain of F&J's trade creditors that he would personally pay amounts due to them from F&J in the event that F&J was unable to do so. In each such instance, petitioner's guarantee was provided, either orally or in writing, no later than the time of the commitment of funds or credit to F&J. [2]
*43 F&J is the only business for which petitioner ever solicited funds. F&J is also the only business for which petitioner ever guaranteed either the repayment of loans or equity contributions, or the payment of trade creditors. Following commencement of production of the derusting substance at its Rahway, New Jersey factory, F&J hired sales personnel, and some sales of its product were made. During 1970 through 1972, however, F&J experienced serious product difficulties. These difficulties, which related to the excessive acidity level of the derusting substance and its corrosive effect upon certain garments, were disclosed, in one instance, during a promotional display of the product at a store in Florida. At the display, the product burned a hole in a participant's clothing, resulting in its removal from the store and its return to F&J. In or around 1971, the Bureau of Securities of the State of New Jersey began an investigation of petitioner and of F&J, relating to suspected violations of New Jersey securities laws. As a result of this investigation, on June 27, 1972, the State of New Jersey's Bureau of Securities entered into a consent order with F&J and petitioner (hereinafter *44 referred to as "consent order") requiring F&J or petitioner, in pertinent part, to: * * * repurchase all securities heretofore issued to stockholders of record of [F&J] (other than Joseph Cricco, President and Director; and Stuart Modell, Secretary-Treasurer and Director), by tendering to them the full amount paid by each purchaser for said securities together with 6% interest per annum from the date of payment. As early as 1970, F&J became unable to meet certain of its financial obligations. The company's financial difficulties resulted in at least three civil collection actions against F&J and petitioner. First, in or around September 1970, Vincent J. Rinaldi brought an action against F&J and petitioner in the Superior Court of New Jersey to collect on a $10,000 loan he had made to F&J.For many years prior to his making such loan, Rinaldi had been a client of petitioner's accounting practice. At an undisclosed time, petitioner repaid Rinaldi's loan to F&J. Second, in or around August 1970, one Harry H. Capell brought an action against F&J, petitioner and others in the Superior Court of New Jersey to collect the allegedly uncollected portion of each of two loans made by *45 Capell in connection with F&J. Third, an action was brought against petitioner and others by one Frieda Else in the Superior Court of New Jersey to collect on loans made to F&J. A consent order was entered by the Court in the latter action in 1974, requiring petitioner to pay Else the sum of $16,877. F&J's financial, legal and product difficulties persisted through 1970 and 1971, finally resulting in the termination of the company's operations during the middle of 1972, and the voiding of its certificate of incorporation in May 1974. During taxable years 1971 and 1972, when F&J could not meet its financial obligations, petitioner personally repaid lenders and shareholders who had advanced funds to F&J, to each of whom he had given his personal guarantee of repayment, and paid trade creditors who had extended credit to F&J, to each of whom he had given his personal guarantee of payment, in the following amounts: Trade
Taxable year
Lenders
Shareholders
Creditors
Totals
1971
$39,426
$16,545
$6,034.00
$62,005.00
1972
30,026
13,700
19,685.89
63,411.89
In each such instance, petitioner paid or repaid the lenders, shareholders and *46 trade creditors of F&J because of his personal guarantees, by which he felt legally bound. To the extent that F&J's shareholders were repaid by petitioner, in whole or in part, pursuant to the consent order, dated June 27, 1972, petitioner's payments were additionally motivated by compliance with said consent order. To the extent that F&J's lenders were repaid by petitioner pursuant to the foregoing legal actions, petitioner's payments were additionally motivated by the filing and/or the disposition of such actions. On "Schedule C" of their Federal income tax returns for taxable years ending December 31, 1971, and December 31, 1972, petitioners claimed business expense deductions in the respective amounts of $79,481 and $80,643. By notice of deficiency issued on August 17, 1977, respondent disallowed $62,005 of the business deduction for 1971, and $63,412 of the business deduction for 1972, reflecting the aggregate amounts paid by petitioner to lenders, shareholders and trade creditors of F&J in those years. Respondent determined that these disallowed amounts should be treated as nonbusiness bad debt losses, resulting in additional allowed capital loss deductions for the two *47 years, respectively, of $788 and $1,000. OPINION Petitioners contend herein for full deductibility of petitioner's payments to lenders, shareholders and trade creditors of F&J during 1971 and 1972, as ordinary and necessary expenses of petitioner's accounting business, pursuant to section 162(a), or in the alternative, as business bad debts pursuant to section 166(a). According to respondent, on the other hand, only payments to lenders and creditors of F&J are deductible, and then only as nonbusiness bad debt losses pursuant to section 166(d). [3]
*48 Section 166(a) allows a deduction from ordinary income for "any debt which becomes worthless within the taxable year." Pursuant to section 166(d), in the case of an individual taxpayer, losses deriving from any nonbusiness bad debt must be treated as short-term capital losses. These provisions apply, however, only where a loss is attributable to a bona fide debt; that is, "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Section 1.66-1(c), Income Tax Regs.
It is well established that a guarantor of such a bona fide debt, upon payment, "stands in a creditor-debtor relationship with his principal." Horn v. Commissioner,59 T.C. 319, 334-335 (1972), affd. 523 F.2d 1363 (9th Cir. 1975), cert. denied, 439 U.S. 892 (1978). In Putnam v. Commissioner,352 U.S. 82 (1956), the Supreme Court held that the payment by a *49 guarantor creates a debt against the principal obligor by operation of the state law of subrogation, and that this applies even when the principal obligor is insolvent or nonexistent at the time that the guarantee is paid. It has since been held that guarantor losses will be treated as a bad debt, even where the guarantor is not subrogated to the rights of the creditor pursuant to state law. Horne v. Commissioner,supra;United States v. Hoffman,423 F.2d 1217 (9th Cir. 1970); Stratmore v. United States,420 F.2d 461, 465 (3d Cir. 1970), cert. denied 398 U.S. 951 (1970). As recently noted by the Court of Appeals for the Sixth Circuit, "A preoccupation with the presence of subrogation rights * * * allows the applicable state law to determine the character of the deduction," in contravention of the principle "that differences in state law should not override the intent of Congress in enacting federal taxing statutes." In re George Franklin Vaughan, Jr.,     F.2d     (6th Cir., October 19, 1983), affg. an unreported case ( E.D. Ky. 1982, 50 AFTR 2d 5820; 82-2 U.S.T.C. par. 9573). *50 Significantly, where section 166 is applicable, "Congress has legislated specially," Putnam v. Commissioner,supra at 87, and application of the general business deduction authority of section 162(a) is superseded. Horne v. Commissioner,59 T.C. at 336 (1972); Roussel v. Commissioner,37 T.C. 235, 243 (1961). Thus, "a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all." Putnam v. Commissioner,supra at 88. Turning to the present case, in light of these legal principles, we conclude that petitioner's payments during 1971 and 1972 to F&J's lenders, in the respective amounts of $39,426 and $30,026, and to F&J's trade creditors, in the respective amounts of $6,034 and $19,686, gave rise to a debtor-creditor relationship between him and F&J. The failure of F&J as a business enterprise during 1971 and 1972 established the worthlessness of such debts, [4] resulting in the exclusive applicability of section 166 to petitioner's payments and leaving *51 for our determination the character of the ensuing deductions under that section. As to F&J's shareholders, we have found that petitioner's payments in 1971 and 1972, were motivated, not only by his personal guarantees, but also by the consent order entered into with the New Jersey Department of Securities. Insofar as the former motivation pertained in 1971 and 1972, the discharge of petitioner's obligations as guarantor failed to give rise to a debtor-creditor relationship between him and F&J since no such relationship existed between F&J and its shareholders. [5]
*52 Thus, insofar as petitioner's payments during 1972 to shareholders of F&J may have been additionally motivated by the terms of the consent order, such payments neither covered a corporate obligation of F&J, so as to bring them within the ambit of Putnam v. Commissioner,supra and its progeny, nor otherwise engendered a bad debt loss within the meaning of section 166. Accordingly, section 166 is inapplicable to petitioner's payments during 1971 and 1972 to shareholders of F&J, and deduction of these payments, in the respective amounts of $16,545 and $13,700, must be evaluated under the alternative section 162(a) grounds contended for by petitioners. Issue 1. Section 166: Character of Deductions for Payments to Lenders and Trade Creditors
We have determined that petitioner's payments in 1971 and 1972 to F&J's lenders and trade creditors gave rise to losses from bad debts within the meaning of section 166. Pursuant to section 1.166-8(b), Income Tax Regs., which is applicable to losses incurred by noncorporate guarantors of corporate *53 obligations on guarantee agreements made prior to January 1, 1976, the character of petitioners' resulting deductions depends upon whether such losses resulted from business or nonbusiness bad debts within the meaning of section 166 and regulations thereunder. While business bad debts are fully deductible against ordinary income pursuant to section 166(a)(1), nonbusiness bad debts are deductible only as short-term capital losses pursuant to section 166(d). A nonbusiness debt is defined as any debt other than the following: (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. [Section 166(d)(2)(A) and (B)]. Whether a debt is thus excluded from the class of nonbusiness debts is a question of fact in each particular case, and will depend upon whether the loss resulting from worthlessness of the debt was proximately related to the taxpayer's business. Whipple v. Commissioner,373 U.S. 193, 201 (1963); Stratmore v. United States,supra at 463. In this case, petitioners and respondent *54 are in accord that petitioner's business, relative to which the foregoing standard must be applied, was his ongoing accounting practice, which occupied 75 percent of his working time during the years that he was also involved with F&J, rather than his activities on behalf of F&J. We must therefore determine whether petitioner's losses resulting from the worthlessness of F&J's debts were proximately related to the conduct of his accounting practice.In this inquiry, we are guided by the test established by the Supreme Court in United States v. Generes,405 U.S. 93, 103 (1972), pursuant to which the requisite business proximity depends upon the existence of a dominant business motivation. Since petitioner was motivated to make the subject payments principally by the legal obligations which he considered to arise from his personal guarantees, our analysis of petitioner's motivations under section 166(d) must focus upon the reasons for petitioner's entry into such guarantee agreements. Cf. United States v. Generes,supra at 100-101. As aptly noted by *55 the United States Court of Appeals for the First Circuit in French v. United States,487 F.2d 1246, 1248 (1973): The fallacy of emphasizing the circumstances of payment instead of those surrounding the incurring of the loss may be illustrated in simple terms by considering an individual whose business success depends on his personal credit rating, and who says that since nonpayment of his personal bills would injure his credit, paying them is a business expense. However attractive, this is not a viable proposition. [6]
*56 In accordance with the Generes test, to obtain a deduction for a business bad debt under section 166, petitioners have the burden of proving that petitioner entered into guarantee agreements with lenders and trade creditors of F&J, out of which the subject losses arose in 1971 and 1972, with the predominant motive of protecting his accounting practice. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). On this record, we conclude that petitioner has failed to meet this burden, thus precluding business bad debt treatment for those losses. At the time petitioner first observed Cricco's derusting process he believed that it was a "great idea" which would make a "great business." Realizing "that the company [would need] money to exist, to start, and to expand," petitioner "went to clients to raise money," some of whom "invested money in [F&J] as stock," and others of whom "lent the money as loans." Petitioner additionally solicited funds for F&J from among those who were not clients of his accounting practice. For both client and non-client investors, lenders *57 and trade creditors, at the time of his promotion of F&J, petitioner offered his personal guarantees of repayment, and these guarantees were accepted. Evidence of the factors motivating petitioner's guarantees is provided by the testimony of two clients of petitioner's accounting practice, Vincent J. Rinaldi and Irwin Yavelberg (hereinafter referred to as "Yavelberg"), whose investments in F&J petitioner had guaranteed and then reimbursed. While these client-investors became shareholders of F&J, we believe that their testimony is equally probative of petitioner's motivation in guaranteeing loans and extensions of credit to F&J at or about the same time. Both client-investors testified to their beliefs that petitioner's activities on behalf of F&J were separate from his accounting business, and that petitioner was not acting as an accountant when he recommended their investments in the company. According to Yavelberg, petitioner was offering "more of an opportunity for a friend than as a business associate." Yavelberg described his meeting with petitioner concerning possible investment in F&J, as follows: And [petitioner] said * * * we need some getting started money, *58 you can get in early and I think it's a good deal. And I guess I said * * * I really didn't want to invest my savings in something this risky. And about a week later we talked again and he said that he understood my feelings and he still thinks it's an opportunity too good to pass up, and to let me get in on it, * * * he would give me a personal guarantee that he would pay me back. So I said okay. Later, Yavelberg further testified, when petitioner asked him whether he had friends or relatives who might also wish to invest in F&J, "I said I really wouldn't want to put them under any risk, at which point [petitioner] said he would give them the same blanket guarantee * * * if anything went wrong, he would take personal responsibility." On the strength of petitioner's guarantee offer, according to Yavelberg, he recommended F&J to several friends and to his father-in-law, all of whom invested in the company. On this record, we conclude that petitioner entered into guarantee agreements with F&J's investors, as well as with its lenders and trade creditors, some of whom were clients of his accounting practice, principally for the purpose of inducing their participation in *59 what he believed to be a promising business venture, in which he had invested, and which was at that time in need of capital for operation and expansion. While petitioner's reputation as an accountant may have influenced such investors, lenders and trade creditors to rely upon his personal guarantees, petitioner has not demonstrated how protection of his accounting business reputation may have motivated his entry into such guarantees. In the absence of a dominant business motivation, petitioner's losses from payments to lenders and creditors of F&J during 1971 and 1972 fail to meet the proximate relationship standard of section 166 and section 1.166-5(b), Income Tax Regs., and such payments gave rise to nonbusiness bad debt losses under section 166(d), deductible solely as short-term capital losses. [7]United States v. Generes,supra.
*60 Issue 2. Section 162(a): Deductibility of Payments to Shareholders
Our disposition of the first issue herein leaves for decision the deductibility under section 162(a) of petitioner's payments to F&J's shareholders during 1971 and 1972, in discharge of his guarantee obligations, in the respective amounts of $16,545 and $13,700. Section 162(a) provides for a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Petitioners and respondent are in accord that petitioner's accounting practice was the business relative to which we must test the deductibility under section 162(a) of his payments to shareholders of F&J. It is the position of petitioners that the subject payments, made for the primary purpose of preserving and protecting petitioner's business reputation, were both ordinary and necessary, and proximately related to his accounting practice. Respondent, in support of its position that such payments were neither ordinary, necessary, nor proximately related to petitioner's business, states *61 first, that petitioner was primarily motivated to make the payments by personal and investment considerations; second, that petitioner's accounting practice was not economically dependent upon the existence of F&J; third, that the transaction out of which the payments arose was not a common or frequent occurrence in the practice of an accountant; and fourth, that the payments were proximately related to petitioner's investment in F&J, rather than to his accounting practice. It is well settled that where a payment is made to protect or promote an established business, the fact that the transaction giving rise to such payment originated with another person or entity, will not prevent its deductibility under section 162(a). See Lohrke v. Commissioner,48 T.C. 679, 685 (1967), and cases cited therein. In such instances, "[t]he crucial and controlling factor lies in determining whether the acts done and expenditures made were motivated by a purpose to protect or to promote the taxpayer's business or were made as an investment in a new enterprise." Snow v. Commissioner,31 T.C. 585, 591 (1958). *62 See also Gould v. Commissioner,64 T.C. 132, 135 (1975); Lohrke v. Commissioner,supra at 688. Where a taxpayer is motivated primarily by protection of his investment in such a new enterprise, his payments will fail to qualify for deduction under section 162(a). Only where a taxpayer is motivated primarily by protection or promotion of hisown ongoing business do we reach the second requirement implicit in the ordinary and necessary standard of section 162(a); namely, that the expenditure be appropriate "for the furtherance or promotion of that trade or business." Lohrke v. Commissioner,supra at 688. We accordingly turn to an examination of petitioner's motivation in the present case for making payments to shareholders of F&J during 1971 and 1972. We have already found that petitioner made such payments, first, because he considered himself legally bound by his personal guarantees, and second, as to any payments made subsequent to July 1972, because of the consent order entered into with the New Jersey Department of Securities. As in our analysis of the first issue herein under section 166, we must focus this *63 examination upon petitioner's motivations in entering into such guarantees and consent order, since therein lies the "origin of the liability" out of which his expenses arose. Deputy v. Du Pont,308 U.S. 488, 494 (1940). Cf. Roussel v. Commissioner,supra at 242 (in distinguishing between a debt and either a capital contribution or an expense which might be deductible under section 162(a), "[t]he courts * * * have determined the character of the payment pursuant to the guaranty as of the time of the guaranty rather than the time of the payment."). As to petitioner's guarantees of investor's contributions to F&J, we have already held, chiefly on the strength of the testimony of two such investors who were also clients of petitioner's accounting practice, that petitioner was motivated by promotion of a promising business enterprise, in which he had invested, and which required capital for operation and expansion, and not by protection of his ongoing accounting practice. As to petitioner's motivation for entry into the consent order with the New Jersey Department of Securities, the July 23, 1971 order preceding entry of such consent order *64 required petitioner to show cause "why [he] should not be prohibited permanently from offering or selling any securities from or within the State of New Jersey." Petitioners have failed to show how the avoidance of this prohibition by entry into the consent order in July 1972, was motivated by protection or promotion of petitioner's accounting practice. [8]
*65 On this record, petitioner's payments to shareholders of F&J during 1971 and 1972 fail to qualify as deductible business expenses under section 162(a). To reflect the foregoing, Decision will be entered under Rule 155.
[9]
Footnotes
1. All statutory references herein are to sections of the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all references to the Rules are to the Tax Court Rules of Practice and Procedure, unless otherwise stated.↩
2. At trial, petitioner testified that he offered his personal guarantees to F&J's lenders, shareholders and trade creditors only after the company began to fail. For several reasons, we do not find this testimony to be credible. First, petitioner's testimony on this point was inconsistent since he testified both that the guarantees to trade creditors arose only after F&J began to fail, and that such trade creditors had "extended some service or some goods based upon the fact that I said, yes, I will guarantee the fact that you will get paid." Second, respondent's witness, Irwin Yavelberg, who testified that he (as well as his father-in-law and several friends) had invested in F&J at petitioner's suggestion, stated that such investment was made only after petitioner provided his personal guarantee. Third, petitioners state on brief that "[p]etitioner, acting as a type of guarantor, insured his clients that he would indemnify them for any losses which they may suffer, if the new corporation failed," clearly indicating that the guarantees preceded the failure of F&J. Fourth, in a loan collection action brought against F&J, petitioner and others by Vincent J. Rinaldi, a client of petitioner's accounting practice, Rinaldi maintained as follows: Defendant, STUARY M. MODELL, has personally guaranteed payment of the sum of Ten Thousand ($10,000.00) Dollars, plus all costs and interest, in the event of a default, and said guarantee is in writing and signed by the Defendant, STUART M. MODELL, [Emphasis added.] The foregoing suggests that petitioner's guarantee was provided to Vincent J. Rinaldi prior to the failure of F&J. On this record, which contains no corroborative evidence of petitioner's claim, we find that the subject guarantees were entered into no later than the time of the commitment of funds or credit to F&J.↩
3. The notice of deficiency provides, in pertinent part, as follows: It is determined that the deductions claimed as other business expenses in the amount of $62,005.00 for 1971 and $63,412 for 1972 are not allowable as such, but are deemed to be nonbusiness bad debts which are treated as short-term capital losses. This determination includes payments made by petitioner during 1971 and 1972, not only to F&J's lenders and trade creditors, but also to F&J's shareholders. Based upon this determination, respondent allowed petitioners capital loss deductions of $1,000 for both 1971 and 1972, of which $212 in 1971 related to transactions not at issue herein. These allowed deductions were based upon the $1,000 limitation of sec. 1211(b)(1)(B), as in effect for those tax years. Although they had theretofore relied exclusively on sec. 162(a) to support their claimed deductions, petitioners for the first time on brief raised their alternative argument that the foregoing payments qualified as business bad debts under sec. 166↩. Respondent, indicating that it was not prejudiced thereby, joined this issue in its reply brief. While not without ambiguity, we believe that respondent joined this issue only as to petitioner's payments to lenders and trade creditors of F&J, and not as to shareholders of the company, and we proceed based upon this understanding of respondent's position.
4. While the evidentiary record herein fails to address with specificity the ability of F&J to reimburse petitioner prior to its dissolution in 1974, respondent has not challenged the worthlessness of F&J's debts to petitioner during the years at issue. Our conclusion as to the worthlessness of such debts therefore rests upon the indications of F&J's troubled financial condition during 1971 and 1972, and upon respondent's failure to raise this issue. Cf. Cho v. Commissioner,T.C. Memo. 1976-318↩.
5. It is elementary corporate law that a corporation and its shareholders do not occupy the positions of debtor and creditor. See John Kelly Co. v. Commissioner,326 U.S. 521↩ (1946); Fletcher Cyclopedia Corporations, Vol. 11, Chap. 58, §§ 5085, 5098 (1971).
6. This decision is quoted at some length on this point, with approval, in a Memorandum Opinion of this Court, Cho v. Commissioner,T.C. Memo. 1976-318. In determining in Cho that the taxpayer's predominant motive was nonbusiness-related, this Court focused upon the fact that the guarantees at issue therein "were enteredinto for reasons extraneous to petitioner's businesses," [Emphasis added.] noting as follows: The statute and the regulations do not tell us at what point in time we should look to determine proximity in a guaranty context. The courts have filled this gap by holding that the time to determine proximity is the time when petitioner entered into his guarantee agreements. 35 T.C.M. at 1446; 45 P-H Memo T.C. par. 76,318 at 76-1421.↩
7. In support of their position that these losses should be deductible as business bad debts, petitioners rely principally upon a Memorandum Opinion of this Court, LaStaiti v. Commissioner,T.C. Memo. 1980-547. As we have previously noted, whether a debt is a nonbusiness debt is a question to be decided on the facts in each particular case. Sec. 1.166-5(b), Income Tax Regs. On the facts in LaStaiti, this Court, applying the test of taxpayer's dominant motivation in entering into the loan guarantee and loan at issue, determined that the taxpayer was motivated predominantly by protection of his employment, giving rise to business bad debt deductions under sec. 166. In LaStaiti, in contrast to the present case, taxpayer made and guaranteed loans on behalf of a beauty enterprise which he had founded at a time when he had concerns about the failure of the enterprise, and the effect of such failure upon his continued employment as a bank officer. Relying, in part, upon the taxpayer's testimony, this Court found that his concerns were reasonable, and had motivated his entry into the guarantee and loan at issue. More pertinent to the present case, however, is our Memorandum Opinion in Cho v. Commissioner,T.C. Memo. 1976-318↩, wherein the taxpayer co-guaranteed loans to a timber export business at a time when such business, which he had helped to initiate when medical problems impaired his ability to pursue his accounting practice, was a promising new enterprise. In holding the taxpayer's payments, in discharge of such guarantees, to be nonbusiness bad debt losses, this Court determined that "[a]t the time [the taxpayer] entered into the guaranties * * * he did so to protect his investment * * * to keep the company going." 35 T.C.M. at 1446; 45 P-H Memo T.C. par. 76,318 at 76-1421.
8. We note, finally, that the present case is distinguishable from three decisions of this Court relied upon by petitioners; namely, Milbank v. Commissioner,51 T.C. 805 (1969); Pepper v. Commissioner,36 T.C. 886 (1961); Marks v. Commissioner,27 T.C. 464 (1956). In each such case, exigent factors which were proximately related to the taxpayer's established business motivated the payments at issue. Thus, in Milbank, the taxpayer, who had promoted and invested in a corporate wallboard manufacturing plant in Cuba, personally paid debts of the corporation following its expropriation by the Cuban revolutionary government, in order to protect his reputation for integrity as an investment banker (taxpayer's contention, in support of his argument for deductibility under sec. 166, that he had guaranteed the loans at issue, was rejected by the Court). The payments in Pepper were made by the attorney-taxpayers, who had assisted their client in securing financing for his plastic housewares business venture, in order to protect their established legal practice following the larceny conviction of such client, and the ensuing financial collapse of his business. Finally, in Marks, taxpayer's investment banking firm dealt in stock of a corporation in which he was a shareholder and officer. Upon disclosure of possible liability of the taxpayer to such corporation under Federal securities laws, to avoid litigation which might have a damaging effect upon his business reputation, the taxpayer paid to the corporation the maximum amount it could in any event recover. On these facts, the payments in each case were held deductible under sec. 162(a)↩, as expenses which were ordinary and necessary to protection of the taxpayer's business. As we have found, however, the guarantees which fixed petitioner's obligation of payment in the present case, were made to induce contributions at a time when F&J was a new and promising venture in which petitioner had invested, and were entered into without regard to the ensuing product, financial and legal difficulties which led to F&J's failure.
9. While we have disallowed nonbusiness bad debt loss deductions for petitioner's payments to F&J's shareholders in 1971 and 1972, which had been allowed in respondent's deficiency determination, because of the $1,000 limitation of sec. 1211(b)(1), in effect in 1971 and 1972, no change in the amount of petitioner's allowable deductions for these years results. Decision is to be entered under Rule 155, however, since the parties have agreed that petitioners will be entitled to the benefits of income averaging for tax years 1971 and 1972.↩